(165 App. Div. 59)

### PEOPLE v. DUNBAR CONTRACTING CO. et al.

(Supreme Court, Appellate Division, Second Department. December 18, 1914.)

1 CORPORATIONS (§ 529*)—CRIMINAL RESPONSIBILITY—"PERSON."

In view of Penal Law (Consol. Laws, c. 40) § 580, defining conspiracy by two or more persons to commit a crime, to cheat or defraud, etc., and section 1932, declaring that a corporation convicted of an offense, for the commission of which a natural person would be punished by imprisonment, shall be punished by a fine of not more than $5,000, and General

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Construction Law (Consol. Laws, c. 22) §§ 1–37, declaring the term "person" to ·include corporations, a corporation may be convicted for conspiracy, in which a specific intent is a necessary and controlling element.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2140–2144; Dec. Dig. § 529.*

For other definitions, see Words and Phrases, First and Second Series, Person.]

2. CONSPIRACY (§ 47*)—NATURE AND ELEMENTS OF OFFENSE—EVIDENCE.

It is not necessary that there be independent proof of a conspiracy before acts can be proven in furtherance of it, but the same evidence may establish both a conspiracy and the overt acts charged.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 105–107; Dec. Dig. § 47.*]

3. CONSPIRACY (§ 47*)—CIRCUMSTANTIAL EVIDENCE.

Evidence establishing a conspiracy and the overt acts charged may be wholly circumstantial.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 105–107; Dec. Dig. § 47.*]

4. CONSPIRACY (§ 47*)—VIOLATION OF PUBLIC CONTRACT—SUFFICIENCY OF EVIDENCE.

In a prosecution for conspiracy to cheat and defraud the state, by failing to perform labor and furnish material required by a state contract for the repair of a highway, and by falsely representing that the work had been done and the materials furnished according to the contract, and obtaining payments therefor, evidence *held* to sustain a conviction.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 105–107; Dec. Dig. § 47.*]

5. CRIMINAL LAW (§ 423*)—EVIDENCE—ACTS AND DECLARATIONS OF CO-CONSPIRATOR.

In such prosecution, where the state contended that, as part of the conspiracy and for the purpose of making it effectual, defendant D. procured a state official to put defendant F. in charge of the work as superintendent for the state, evidence as to a telephone conversation in which D. asked for the appointment of F., and as to a letter, signed by defendant D., referring to the conversation and requesting that F. be assigned as the state's superintendent of work under the contract, was admissible as acts and declarations of a co-conspirator.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 989–1001; Dec. Dig. § 423.*]

6. CRIMINAL LAW (§ 854*)—TRIAL—SEPARATION OF JURY.

In the trial of a criminal case, the court directed the division of the jury into two parts, one officer taking six to one hotel and another taking the other six to another hotel, and after the conclusion of the charge at 11:30 directed the two officers to take the jurors to dinner at 12 o'clock, which was done, the officers keeping with the jurors while outside the jury room, and not allowing them to talk among themselves about the case, and returning them to the jury room immediately after their dinner. *Held*, that any separation of the jury was not prejudicial to defendants.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2039–2047; Dec. Dig. § 854.*]

Appeal from Trial Term, Rockland County.

The Dunbar Contracting Company, Bart Dunn, and Joseph J. Fogarty were convicted of conspiracy. From the conviction, and from orders denying their motions in arrest of judgment and for a new trial, they appeal. Judgment and orders affirmed.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

See, also, 143 N. Y. Supp. 337.

Argued before BURR, THOMAS, CARR, RICH, and STAPLE-TON, JJ.

William Travers Jerome, of New York City (Mortimer B. Patterson, of Nyack, on the brief), for appellants.

Thomas Gagan, Dist. Atty., of Haverstraw, for respondent.

RICH, J. The defendants were indicted for the crime of conspiracy under the provisions of subdivision 4, § 580, of the Penal Law; the charge being that they conspired to cheat and defraud the state of New York, by omitting to perform labor and furnish material required by a contract between the state and the defendant the Dunbar Contracting Company for the repair of a highway in the county of Rockland, and by furnishing material inferior in quality and less in quantity than called for by said contract, and in falsely and fraudulently representing to the state that the work and materials, in quantity and quality, had been done and furnished as provided for and required by said contract, and thus obtaining payments thereunder that they were not entitled to, but would have been if the requirements of the contract had in fact been complied with. The defendant Dunn is the president and treasurer of the defendant company, and the defendant Fogarty was the representative of the state, supervising and in charge of the work on said highway. The jury found all of the defendants guilty, and from the judgment of conviction, and from two orders, one denying their motion for the arrest of judgment, and the other denying their motion to set aside the verdict and for a new trial, the defendants appeal.

[1] Before pleading, the defendants demurred to the indictment upon various grounds, the defendant company basing its demurrer in part upon the contention that the crime of conspiracy requires a specific criminal intent and that a corporation is incapable of committing any crime requiring criminal intention, because of which the indictment against it would not lie. The demurrers were severally overruled at Special Term, and it is now contended that this was error. This contention is without merit. Upon both principle and authority a corporation may be indicted and convicted for conspiracy and similar crimes of which specific intent is the necessary and controlling element. Penal Law, §§ 580, 1932; General Construction Law, §§ 1–37; Bishop's New Criminal Law, vol. 1, § 417, subd. 2–4; People v. Woodbury Dermatological Inst., 124 App. Div. 879, 882, 883, 109 N. Y. Supp. 578, approved and affirmed 192 N. Y. 454, 85 N. E. 697; People v. Rochester Railway & Light Co., 195 N. Y. 102, 105, 88 N. E. 22, 21 L. R. A. (N. S.) 998, 133 Am. St. Rep. 770, 16 Ann. Cas. 837; N. Y. C. & H. R. R. R. Co. v. United States, 212 U. S. 481, 29 Sup. Ct. 304, 53 L. Ed. 613; Buffalo Lubricating Oil Co. v. Standard Oil Co., 106 N. Y. 669, 12 N. E. 826; State v. Eastern Coal Co., 29 R. I. 254, 70 Atl. 1, 132 Am. St. Rep. 817, 17 Ann. Cas. 96, 102; United States v. MacAndrews & Forbes Co. (C. C.) 149 Fed. 823; Cohen v. United States, 157 Fed. 651, 85 C. C. A. 113; United States v.

Young & Holland Co. (C. C.) 170 Fed. 110; State v. Passaic County Agricultural Society, 54 N. J. Law, 260, 23 Atl. 680.

[2, 3] It is contended that there is no direct evidence of a conspiracy between the parties, and that there must be independent proof of the conspiracy before acts can be proven in furtherance of it. This contention is also without merit. The same evidence may establish both the conspiracy and overt acts charged, and the evidence may be wholly circumstantial. People v. Miles, 123 App. Div. 862, 108 N. Y. Supp. 510; People v. Micelli, 156 App. Div. 756, 761, 142 N. Y. Supp. 102.

[4] In the case at bar the violations of the contract were so flagrant as to compel the conclusion that they were the result of a conspiracy on the part of the defendants to cheat and defraud the state. Dunn, as I have said, was the president and treasurer of the Dunbar Contracting Company. He was also its principal stockholder, owning 18 of the 20 shares of authorized stock. He executed the contract in behalf of the company and had general supervision of its performance. He knew what the contract required, and is shown to have known the manner in which the work was actually performed and that its provisions were flagrantly ignored. It seems that Fogarty had been in the employ of both Dunn and the Dunbar Contracting Company before the work was commenced, and was subsequently appointed by the state authorities as a foreman of laborers on state roads upon the recommendation of the Dunbar Contracting Company. He was assigned to road 91, which the company had contracted to repair, at the request of Dunn, and it was his duty to see that the contract was executed strictly in accordance with its requirements and to make actual measurements and monthly estimates based thereon, showing the amount of work and amount, kind and character of material furnished, and forward the same to the state department of highways. Upon such estimates the state paid the contractor, the Dunbar Contracting Company. He was the only representative of the state on road 91, and was present during the progress of the work. He knew what the contract required, and knew, as it was his duty to know, the work that was actually done, and materials actually furnished and used, both in quality and quantity, and it was likewise his duty as the representative of the state to compel strict performance of the contract requirements.

The contract required, among other things, that 2.9 miles in length and 16 feet in width of the road, amounting to 27,220 square feet surface measurement, should be scarified, and defined such scarification as being the breaking up and loosening of its macadam surface by hand or mechanical scarifier, forking the stone clear of dirt and other foreign matter, and replacing them in their cleaned condition, raking them to a uniform grade and crown, and rolling the same, the dirt being placed on shoulders and the roadway shaped to receive the grout preparatory to placing the concrete top course provided for. The evidence shows that, instead of doing this, the Contracting Company merely tore up a part of the macadam surface, leaving a base for the grout and concrete other than that required by the contract, threw all the stone so loosened out of the roadway, and, without cleaning

them from the adhering dirt and other matter, crushed and used them as an ingredient of the concrete in place of the screened gravel required to be used therefor. This was a radical departure from the requirements of the contract. The roadbed was never prepared as required to receive the Portland cement grout, of which the contract required 757 cubic yards to be used on the 2.9 miles referred to, which would cover that entire length the width of 16 feet, to a uniform depth of one inch. Instead of placing the grout upon the cleaned returned stone of the old roadbed, after it had been brought to the grade required, the company first placed concrete upon the base it had created, contrary to the contract requirements, and over the concrete spread a poor quality of very thin grout, with brooms, to the depth of from one-eighth to one-quarter of an inch—nowhere exceeding that depth. There was used but 189¼ cubic yards of grout, 567¾ yards less than the contract required. It appears that the grout as so applied was of no value in the repair of the roadbed. It was intended to cement together and solidify the clean stone forming the base, and by so doing make a solid and substantial bed for the concrete surface. This effect was entirely lost by placing it on top of the concrete, where it served only to cover it, and to superficially indicate that the concrete being used was good and substantial.

The contractor was required to furnish and place upon the surface of the roadbed, for 2.9 miles in length and 16 feet in width, 2,270 cubic yards of second-class gravel concrete, the gravel to be screened and washed, uniformly spread to a depth of 3 inches when compacted. For a distance aggregating 4,600 feet of this road no concrete was used. The total quantity of concrete furnished and used was 1,135 cubic yards—one-half of the quantity required by the contract and actually paid for by the state. It covered the roadbed only 1½ inches, instead of 3, and in its composition the stone taken from the old roadbed, owned by the state and which was required to be used for a solid foundation for the concrete surface, was used, instead of gravel. It appears that the stone were not cleaned before being crushed, and the concrete made from it was poor and of no value as a road surface, and that it was so soft that it would not hold together. In quality as well as quantity it was below the requirements of the contract, and the road, when pronounced completed, was really in no better condition than before repairs were commenced.

Without further consideration of the evidence in detail, it is sufficient to say that these radical departures from the contract, known to all of the defendants, could not have been honest and innocent mistakes, and they could not have been successfully accomplished by the contractor, with the knowledge and consent of Fogarty, except in the furtherance of a conspiracy to cheat and defraud the state. The contention of the learned district attorney that the failure to comply with the contract in the particulars noted was willful and corrupt is sustained by the evidence. The object and intent of the defendants is shown to have been to profit unlawfully at the expense of the state, and to accomplish that purpose their efforts seem to have been directed to every condition that held out a promise of success.

Six different estimates, made and certified by Fogarty, purporting to correctly show the material furnished and work done during each month, and the amount of money to which the contracting company was entitled under its contract, purporting to be based upon actual inspection and measurements made by him, were each false, and necessarily known to be false by the defendants. The defendant Dunn also certified at least twice, in the receipts executed by him for his company as conditions precedent to payment, that the amount therein stated to be due and unpaid was in full payment of the account, which was found by him after personal investigation to be a correct account of work done and materials furnished under said contract in the repair of said road, which statements were false, and necessarily known by him to be so when made. These facts establish of themselves an existing conspiracy, and overt acts in furtherance of it, to cheat and defraud the state, entered into and successfully carried out by the defendants, and are amply sufficient to sustain their conviction.

[5] But three of the additional alleged errors upon which the appellants rely possess sufficient merit to require consideration. The people contend that as part of the alleged conspiracy, and for the purpose of making it effectual, Dunn procured the representative of the state, Lynch, to put the defendant Fogarty in charge of the work as the superintendent and representative of the state. Lynch was permitted to testify (and his testimony is not denied), over appellants' objection and exception, to a conversation over the telephone with a person who said he was Dunn, asking for the appointment of Fogarty, and also to the receipt of a letter, which was introduced in evidence over like objection and exception, the day after the conversation over the telephone, dated on the day of such conversation, signed "Bart Dunn," in which the writer said, among other things:

"Also referring to my conversation had with you over phone this a. m., in reference to Mr. Joseph J. Fogarty, who was transferred from Walden to Westbury, Long Island, I would kindly ask you, if you can see your way clear, to place Mr. Fogarty on my road. * * * Any courtesy you may extend to me by granting the above request, I beg to assure you will be appreciated."

Opposite the signature are the letters "Dict."

The learned trial justice in his opinion exhaustively considered the questions presented by these exceptions, and states the evidence upon which his rulings were made, in which I concur. People v. Strollo, 191 N. Y. 42, 83 N. E. 573; People v. McKane, 143 N. Y. 455, 38 N. E. 950; Tichnor Bros., Inc., v. Barley, 149 App. Div. 871, 134 N. Y. Supp. 129; Kansas City Star Pub. Co. v. Standard Warehouse Co., 123 Mo. App. 13, 99 S. W. 765; Conkling v. Standard Oil Co., 138 Iowa, 596, 116 N. W. 822; Barrett v. Magner, 105 Minn. 118, 117 N. W. 245, 127 Am. St. Rep. 531; Miller v. Leib, 109 Md. 414, 72 Atl. 466; Lewis Pub. Co. v. Lenz, 86 App. Div. 451, 83 N. Y. Supp. 841; Cunningham v. Hudson River Bank, 21 Wend. 557; People v. Micelli, 156 App. Div. 756, 142 N. Y. Supp. 102; People v. Campisi, 145 App. Div. 264, 129 N. Y. Supp. 974; People v. Adrogna, 139 App. Div. 595, 124 N. Y. Supp. 68; People v. Peckens, 153 N. Y. 576, 595, 47 N. E. 883.

[6] During the progress of the trial, the court had on several days directed the division of the jury into two parts; one officer taking six jurors to one hotel, and another officer taking the other six to another hotel. The learned court states what occurred on the day the trial was concluded, in answer to the motion of counsel for the defendants for the discharge of the jury, the direction of a mistrial, and the ordering of a new trial, as follows:

"Immediately after the court finished its charge to the jury, the two officers having the jury in charge were instructed by the court to take the jurors to dinner at 12 o'clock. The court's charge was finished about 11:30; and in order that the jurors might be conveniently and promptly served with their dinners, the court directed the officers to do as they have done on previous days during the trial, and one officer took six jurors to one hotel, and the other officer took the other six jurors to the other hotel. The officers were also instructed that they were to be with their respective groups of jurors all the time that they were out of the jury room, and that they were not to allow the jurors to talk among themselves about the case; that they were taken under the direction of the court to these hotels for dinner, and were returned to the jury room immediately after they had their dinner, and the officers have informed the court that they were with the jurors constantly during their absence from the jury room, and not one word was spoken by any juror on any subject connected with the case. The court does not regard that as an irregularity requiring the dismissal of the jury or a direction of a mistrial."

The learned court again considered the occurrence on the motion for a new trial, saying:

"In reference to the alleged separation of the jury, the facts as they appear from the record made up before the jury returned with its verdict, and as they actually are, show that after the judge's charge the jurors were constantly in the custody and care of two duly sworn officers; that by the direction of the court they were taken in two groups, of six each, each group in charge of one of these two officers, to two of the hotels near the courthouse, for dinner; that they were so divided by order of the court for the more convenient and prompt service of their meals; that the members of each group were constantly kept together, and in the immediate custody and presence of the officer in charge; and that they were simply taken from the courthouse to said hotels, and immediately after dinner returned to their room in the courthouse, where they resumed their deliberations that were interrupted when they were taken to dinner; that not a word concerning the case was spoken by any juror during this dinner hour, and that no person spoke a word about the case in the presence or hearing of any of the jurors. The defendants' rights were not and could not possibly have been injured or prejudiced by this action of the court and the conduct of the jurors. They were at all times in the immediate custody and under the direction of the court and its sworn officers, and were no more separated than they would have been had six been put in one vehicle in charge of an officer, and six in another vehicle in charge of another officer, and in that manner taken to a hotel for dinner. * * * Such a separation as occurred in this case does not come within the contemplation of the statute, which requires that the jurors be kept together after the case has been finally submitted."

From the facts presented, it is impossible for the defendants to have been prejudiced by the occurrence.

The remaining exceptions, all of which have been examined, do not present reversible error, and the judgment of conviction and orders appealed from must be affirmed as to each of the appellants. All concur, except CARR, J., not voting.