STATE OF CONNECTICUT *vs.* JOHN E. PARKER.

STATE OF CONNECTICUT *vs.* PAUL M. SMITH.

STATE OF CONNECTICUT *vs.* CLARENCE V. SMITH.

MALTBIE, C. J., HAINES, HINMAN, BANKS and AVERY, Js.

Argued November 10th, 1931—decided February 9th, 1932.

*Benjamin Slade* and *Louis Weinstein,* for the appellants (the defendants).

*Samuel E. Hoyt,* State's Attorney, and *Arthur F. Brown,* with whom, on the brief, was *Abraham S. Ullman,* Assistant State's Attorney, for the appellee (the State).

HINMAN, J. The information charges in substance that The Parker-Smith Company was a corporation organized under the laws of Connecticut and authorized, among other things, to deal in investments of all kinds including loans and notes, to loan on its own behalf and as agent for others and to take security therefor by way of mortgage on real property; that for a long

time and until May 29th, 1929, the defendant Parker was president, the defendant Clarence V. Smith, treasurer, and the defendant Paul M. Smith, secretary of the corporation, and these three were the sole directors; that on or about June 1st, 1928, they and the corporation conspired, confederated, combined, and agreed together to unlawfully convert, appropriate, purloin, and secrete to the use and benefit of the company large sums of money, by means of collecting certain mortgages to the company as trustee, the notes secured by which were owned and held by sundry persons to whom they had been sold by the company, and concealing the payment of the mortgage debts from the noteholders, with intent to use the proceeds of such payments to pay the expenses and liabilities of the company and interest due on other mortgages of which the company was trustee. That thereafter, on divers days between June 1st, 1928, and May 29th, 1929, in pursuance of the conspiracy they collected certain such mortgage debts, failed to give notice to the noteholders that these mortgage debts had been paid, and used the proceeds to pay the debts, expenses, and liabilities of the company and to pay interest due on other mortgages. It is then further alleged, as to each of twenty-four specified mortgages, that the defendants and the company on a specified date collected the named mortgage debt, caused a release to be executed by the company, failed to notify holders of the notes secured thereby that the mortgage had been paid, failed to pay the holders of the notes from the funds collected upon said mortgage, and used the same for the use and benefit of The Parker-Smith Company.

From the record there appears to have been no dispute that the defendants were the sole officers and directors of The Parker-Smith Company and the sole managers of its affairs; that the company was the trus-

tee of all the mortgages specified, and through its officers and agents sold the notes which were secured by the mortgages, the notes being payable to bearer or registered holder and most, if not all, registered with the company; that the mortgages were paid, but no notice thereof given to noteholders, and that interest was continued to be paid to the noteholders after the mortgages had been paid and released.

It also appears to be uncontroverted that while theretofore moneys received from paid mortgages had been deposited in the general bank accounts of the company and paid to the noteholders therefrom, after an examination by the state bank commissioner in 1928 and in pursuance of a suggestion by him, in several instances, the amount received in payment of a mortgage was deposited in a segregated account, designated by the name of the mortgagor, in a West Haven bank. However, instead of the noteholders being paid from such segregated account, as was obviously the intention and purpose of its establishment, it is admitted that no payments were so made, but that from time to time, as the general bank accounts of the corporation became overdrawn, a check on one or more of the segregated accounts would be signed by either Paul Smith or Clarence Smith and deposited in the bank in which the account was overdrawn; and such payments as were made on paid-off mortgage notes were not made by check on the segregated accounts, but on one of the general bank accounts.

Of the twenty-four mortgages specifically referred to in the information, fifteen were made the subject of such segregated accounts, the total amount deposited therein being $165,608.68; the amounts withdrawn therefrom and used as above stated totalled $164,208.68, leaving a balance of only $1400 in segre-

gated accounts on May 29th, 1929, when a receiver was appointed at the instance of the bank commissioner.

The defendants offered evidence to prove that the methods pursued, including the collection of debts secured by mortgage, omission to give notice of such payments to noteholders and payment to them of interest thereafter, deposit of moneys received in payment of trustee mortgages in the corporation's general bank accounts, and payment of principal and interest therefrom, had been used and continued since 1921, with the exception of the intervention of segregated accounts in 1928 as above stated; that complete and accurate accounts were kept; that the trustee mortgages contained no provision requiring notice of payment to noteholders; that all holders of matured notes who presented them for payment were paid; that the bank commissioner had access to the books and to knowledge of the course pursued as to the segregated accounts; that the corporation's attorney advised that the segregated funds might be used for the general purposes of the corporation (which was denied by the attorney except in one instance as to payment of taxes to avoid foreclosure) ; and they claimed that the course of conduct was not with intent to cheat and defraud any noteholder but to protect the interests of all investors, that they believed the assets of the corporation sufficient to pay all noteholders in full, that there was no agreement or understanding between them or any of them to use unlawfully the funds or to cheat or defraud noteholders, but that their acts of omission and commission were due solely to poor business judgment and lack of understanding and were done in good faith.

The assignments of error are extremely numerous, covering the overruling of motions for a bill of particulars, to quash the information, in arrest of judg-

ment, and to set aside the verdict, failure to charge as requested, portions of the charge as given, and rulings on evidence. Many of these relate directly or indirectly to, and are largely determined by, a few general propositions. The first of these is the contention by the defendants that the information was insufficient and the conviction unwarranted, in that neither the object nor the means alleged is criminal, either under statute or common law, and that this is an essential element of the offense charged. We are not required to determine whether either the means or the object alleged is criminal, for the reason that the theory of the case, as set up in the information, presented on the trial, and submitted to the jury, was that the object or the means need not necessarily be, in itself, criminal, but that it is sufficient, in this respect, if the object is unlawful or unlawful means are employed in effecting it. Therefore, as to the criminality of the acts or object involved, we pause only to refute the suggestion of the defendants, in brief and argument, that the opinion in the former appeal (112 Conn. 39, 151 Atl. 325) may be construed as holding that a corporation could not be prosecuted and punished for embezzlement by trustee under the Connecticut statute (§ 6515, General Statutes, 1918) in effect at the time of the acts alleged. The discussion and decision so far as related to § 6515 was confined to the inquiry whether the statute was sufficiently comprehensive to include and support a prosecution of officers of a corporation trustee for misappropriation of trust funds. The present case, also, offers no occasion for decision of the question of the criminal liability, under this statute, of the corporation itself.

The soundness of the principle adopted on the trial is now generally recognized. It conforms in all essential respects to the general definitions of conspiracy

stated by textwriters and adopted in cases here and elsewhere. "In order that a combination may be punishable it must be formed to do either an unlawful act or a lawful act by criminal or unlawful means. . . . It is not essential, however, to criminal liability that the acts contemplated should constitute a criminal offense for which, without the elements of conspiracy, one alone could be indicted. It is an offense independent of the crime or unlawful act which is its purpose; and it will be enough if the acts contemplated are corrupt, dishonest, fraudulent, or immoral, and in that sense illegal. A conspiracy will be indictable if the end proposed or the means to be employed are, by reason of the combination, particularly dangerous to the public interests, or particularly injurious to some individual, although not criminal." 12 Corpus Juris, p. 547; 1 Brill, Cyclopedia Criminal Law, p. 818; 2 Wharton, Criminal Law (11th Ed.) p. 1739; *Fimara* v. *Garner,* 86 Conn. 434, 437, 85 Atl. 670; *State* v. *Stockford,* 77 Conn. 227, 58 Atl. 769; *State* v. *Glidden,* 55 Conn. 46, 8 Atl. 890; *State* v. *Rowley,* 12 Conn. 101, 112; *Commonwealth* v. *Hunt,* 45 Mass. (4 Met.) 111, 121, 123; *State* v. *Burnham,* 15 N. H. 396, 402; *Harris* v. *Commonwealth,* 113 Va. 746, 73 S. E. 561.

The proposition, when broadly stated, is subject to certain limitations, not applicable in the present case, in that some acts or objects may be said to be unlawful and yet not be the subject of criminal conspiracy. "Suppose two or more boys, for instance, agree to go upon another's land; the proposed act is or may be a trespass, and therefore unlawful. If they do not go no harm is done; if they do go they are or may be liable civilly, but no one would seriously contend that in either case they would be liable criminally for the conspiracy. But suppose two or more conspire unjustly and wrongfully to deprive another of his liberty

or property; then, as we shall hereafter see, the criminal law may take cognizance of the act." *State* v. *Glidden, supra,* p. 70. "A purpose to acquire property is lawful so far as it contemplates lawful means only. But if it contemplates the acquisition of money by means of murder, theft, fraud or injustice, the end does not sanctify the means." *State* v. *Glidden, supra,* p. 75.

The various distinctions, and the limitations just mentioned, were appropriately and clearly depicted by the illustrative examples given by the trial court in the course of the charge. It is immaterial whether or not a cheat, which is here alleged to be the object of conspiracy, or false and fraudulent devices by which it is executed, would be punishable as a crime if unassociated with any conspiracy. *State* v. *Gannon,* 75 Conn. 206, 212, 52 Atl. 727; *State* v. *Thompson,* 69 Conn. 720, 725, 38 Atl. 868.

The information may well be construed as charging that both the object and the means adopted to effect it were unlawful, but if either element is established, it is sufficient, in that respect, to support a conviction. The object alleged is in substance the cheating and defrauding of the noteholders of payment of their notes out of the proceeds of the mortgages securing them; the means, concealment from the noteholders that the mortgage debts had been paid, misrepresentation, by inference at least, that they had not been paid by continuing to pay interest thereon, and unlawful appropriation and conversion of the moneys so paid and belonging to the noteholders, to the use and benefit of the corporation; both with intent to cheat and defraud the noteholders. The diversion of the funds as alleged in the present case was manifestly unlawful. 5 R. C. L. 1073. See *Manchester* v. *Sullivan,* 112 Conn. 223, 227, 152 Atl. 134.

The appellants contend, also, that the fraud or cheat alleged is not available in a prosecution for conspiracy in that it is not one which was criminal at common law, because the crime of cheating and defrauding must be accompanied by some false token or device addressed to the public at large, such as a false weight or symbol. The cases which tend to support this contention are few in number and remote in time. The weight of authority is to the effect that conspiracies to cheat and defraud individuals without the use of false tokens and by means which are merely unlawful and not criminal are indictable at common law, and it is immaterial whether or not the cheat which was the object of a conspiracy, or the false and fraudulent devices by which it was executed, would be punishable as crimes if unassociated with any conspiracy. *State* v. *Bradley,* 48 Conn. 535; *State* v. *Burnham, supra; State* v. *Gannon, supra; State* v. *Rowley, supra; State* v. *Stewart,* 59 Vt. 273, 9 Atl. 559; *Commonwealth* v. *Hunt,* 45 Mass. (4 Met.) 111, 121, 123; 12 Corpus Juris, pp. 557, 558. "Cheat and defraud" includes every kind of trick, device, artifice, or deception from false representation and intimidation to suppression and concealment of fact or information, used for the purpose of depriving another of his property or other known right contrary to the plain rules of common honesty. *State* v. *Parker,* 43 N. H. 83, 85; 2 Words & Phrases (1st Series) p. 1107; 11 Corpus Juris, 747. "It has become established that a conspiracy to defraud an individual is indictable by reason of the combination of numbers to do the unlawful thing, though the same wrong actually accomplished by one of the conspirators alone would only be a civil injury, not a crime." "It is the law of conspiracy that its purpose shall be to accomplish something either criminally or civilly unlawful, which unlawful thing may be either

the means or the end. And no lawyer ever denied that to cheat a man is at least a civil wrong." 2 Bishop, Criminal Law (9th Ed.) §§ 198, 202. "A confederacy to cheat by force of combination, even in a way which is not indictable, when designed and effected by an individual singly, adds to the cheating a quality (that of reciprocity of support among the conspirators) which may make it indictable at common law, just in the way that using false weights or tokens make a cheat indictable at common law, when, without such false weights or tokens, it would not be so indictable. The playing of several persons into each other's hands may be, if not a false token, in some measure a false pretense." 2 Wharton, Criminal Law (11th Ed.) p. 1757.

The foregoing also meets the further claim of the defendants, advanced in their motions to quash, and subsequently, that if a conspiracy may be criminal without a criminal object or the employment of criminal means, the combination must be such, in nature and in numbers, as thereby to have the effect of exerting force, threats, or intimidation to accomplish an unlawful purpose or a lawful purpose by unlawful means. On the contrary, as already noted, the exceptions to the criminality of combinations may be generally stated to be limited to those instances where combined numbers have no more power for harm, and do no more harm, than would be worked by a person acting alone, or by individuals separately. Manifestly, a combination of all the persons in active participation in and control of the management and affairs of a corporation "playing into each other's hands" has vastly more capabilities of harm in matters connected therewith, such as are here involved, than would one of such persons acting independently, and without the acquiescence, concurrence, and coöperation of those who, otherwise, would be in a position to obstruct or

prevent unlawful acts or the accomplishment of an unlawful object.

Another contention is that the corporation could not be a party to a conspiracy so that individuals could conspire with it and it could be counted in making up the two or more parties necessary to constitute such conspiracy. This consideration has become academic for the reason that all three of the individual defendants were adjudged to have been participants, satisfying the requirement as to numbers without taking into account the corporation itself. However, we discuss briefly the claim that, in conspiracy, evil intent is of the essence of the crime and that a corporation, from its nature, is incapable of an offense of which a criminal intent is an essential element. The tendency of the law in this respect was tersely expressed in *United States* v. *MacAndrews & Forbes Co.* (1906) 149 Fed. 823, 835: "It was long contended that even a civil liability arising from evil intent could not be visited upon an artificial being. This fiction has vanished, and corporate liability on the civil side firmly established, even for assault. . . . It was even longer denied that a corporation could be indicted at all. . . . It certainly is now admitted law that not only may corporations . . . be indicted for nonfeasance, but for such deeds of misfeasance as are complete by the mere doing of the thing prohibited. . . . These defendant corporations claim that since in conspiracy evil intent is of the essence of the crime, inherent impossibility renders the accusation futile. I think this is but the remnant of a theory always fanciful and in process of abandonment." (Citing *Telegram Newspaper Co.* v. *Commonwealth*, 172 Mass. 294, 52 N. E. 445, 44 L. R. A. 159.) It is now well settled that a corporation may commit crime involving intent to steal or misappropriate property. *People* v. *Canada Fur Trappers Cor-*

*poration,* 248 N. Y. 159, 161 N. E. 455, and cases cited, page 160. See also 1 Brill, Cyclopedia Criminal Law, p. 270. It has also been definitely held that, upon both principle and authority, a corporation may be a party to a conspiracy, counted in computing the number necessary to constitute it, and indicted and convicted therefor. *Standard Oil Co.* v. *State,* 117 Tenn. 618, 670, 100 S. W. 705; *People* v. *Dunbar Contracting Co.,* 151 N. Y. Supp. 164, 166; *State* v. *Eastern Coal Co.,* 29 R. I. 254, 268, 70 Atl. 1; 1 Bishop, Criminal Law, p. 304 *et seq.* Especially is this true where the conspiracy has involved a long course of dealing and a settled practice in the conduct of the business of the corporation which resulted in direct benefits to it.

The only relevance of the evidence offered by the defendants as to the value of the general assets of the corporation, and their belief that these were sufficient to pay all noteholders in full, would seem to be to tend to show an intent to eventually restore and pay to the noteholders in question the money which was diverted from them to the general purposes of the corporation. Such an intent will not suffice to relieve the act of its criminal nature. One who, without right, converts money or property entrusted to him is none the less guilty because he intends at the time to merely use it temporarily and to restore it to the owner in the future. 1 Brill, p. 930; 20 Corpus Juris, p. 437. "Perhaps in a majority of cases the party who violates his trust in such a manner does not expect or intend that ultimate loss shall fall upon the person whose property he takes and misuses. But no hope or expectation of replacing the funds abstracted can be admitted as an excuse before the law. The forger who means to take up the forged paper, the thief who contemplates making eventual restitution, and the man who embezzles money or bonds with the design of restoring them, all

fall under the like condemnation in courts of justice and wherever the rules of sound morality are respected." *Commonwealth* v. *Tenney,* 97 Mass. 50, 59. Numerous cases to the same point are collected in note 52 L. R. A. (N. S.) pp. 1014, 1018 *et seq.* See also *State* v. *Pratt,* 114 Kan. 660, 220 Pac. 505, 34 A. L. R. 189.

The foregoing conclusions, in addition to their effect upon other assignments of error, dispose of the grounds of the motions to quash. The allegations of the information were ample to fairly inform the defendants of the particulars of the offense charged. Insert, Practice Book, p. 302, ¶ 5. There was no error in the denial of the motions for a bill of particulars.

In addition to legal points already discussed and factual considerations some of which have been related as being advanced by the defendants, it is claimed in support of the motions to set aside the verdict that confederation and agreement between them, requisite to a conviction, could not reasonably be found from the evidence. Such combination "may be proved by circumstantial evidence, by proof of the separate acts of the individuals and of circumstances from which the illegal confederation may be inferred. From the nature of the offense itself, such corrupt agreement of the parties, entered into in secret, can only in exceptional cases be established in any other manner. . . . *State* v. *Spalding,* 19 Conn. 233, 237." *State* v. *Thompson, supra,* p. 726.

It is especially urged on behalf of the defendant Parker that it is not shown that he actually received payment of any of the mortgage money or signed any releases or checks or that he had knowledge of the transactions in question. However, the evidence developed several significant facts in this connection which did not appear in the former trial. Among these

may be mentioned the presence of Parker at the conference with the bank commissioner in August, 1928, at which the setting up of segregated accounts and the reasons therefor were discussed, his attendance at directors' meetings held with special frequency in 1929, daily visits to the company's office, and particularly his presence at and participation in the transaction on May 29th, 1929, when moneys were drawn from segregated accounts to pay the fee of the company's general attorney. The circumstances in evidence were ample to support a conclusion that Parker, as well as the Smiths, had knowledge of the conversion and misapplication of moneys held in trust for the noteholders and participated therein to such an extent as to be holden as a party to the conspiracy. There was no error in denying the motions addressed to the verdict and in arrest of judgment.

There remains to be noticed the assignments pertaining to the charge and the rulings on evidence. All have been examined and weighed with diligent care. Detailed discussion of each of the many is impracticable and unnecessary. Such of the requests to charge as were correct in law and adapted and material to the issues were sufficiently complied with. Practically all of the objections to the charge are based upon claims of law which we have discussed and our decision as to them sustains the instructions given in these respects. The few others involve no questions of interest or value outside of the purposes of the instant case, and disclose no material or harmful inaccuracy. During their deliberations, the jury requested a repetition of instructions as to what constitutes conspiracy, and the trial court complied by giving a condensed statement of its previous charge on the subject. In response to a further question it was briefly but clearly explained that the taking of trust funds and

using them for the operation of the business would constitute a conspiracy only if done pursuant to a confederation and agreement so to do. Of necessity, additional instructions given in immediate response to a request are more informal and expressed with less exactness than are studiously prepared formal charges, but we are unable to agree with the claim of the appellants that the jury could have understood, therefrom, that an agreement to use trust funds for company purposes would of itself constitute a criminal conspiracy. The element of intent to cheat and defraud the noteholders had been amply explained in the general charge and was referred to in the supplementary instructions. It is not reasonably to be believed that the jury lost sight of this requisite in reaching their verdict.

The certificates of incorporation and organization, annual reports, and minute book of The Parker-Smith Company were admissible to prove the creation, powers, and continued existence and operation of the corporation, that the defendants were the officers thereof, and their participation in the corporate affairs. The relevancy of the documentary evidence pertaining to the several transactions specified in the information is plain and the order of proof was well within the discretion of the trial court, as was that of proof by unpaid noteholders that they had not been informed that the mortgage had been paid. Many of the questions excluded on cross-examination were patently outside the scope of the direct. The finding shows this to be true as to the assignments relating to cross-examination of Coates, which were particularly stressed in argument. Coates, an accountant, conducted an examination for the State of the books of the corporation, and after giving evidence as to the results thereof bearing upon the payments into and withdrawals from

the segregated accounts, the deposit of the withdrawn funds, and receipts from the other mortgages specified in the information, in the general bank accounts, and the amount due and unpaid to the noteholders in question, testified as to the amount of the corporation's cash on hand and in bank, on the date of receivership. The obviously limited purpose of the evidence last mentioned was to show lack of available cash to meet the obligations to these noteholders. Inquiry by the defendants as to the general assets was not proper cross-examination, and the rulings excluding it were justified, on the finding. However, our perusal of the evidence, which is before us on the motions to set aside the verdict, discloses that, in the course of the same cross-examination, testimony was elicited, either without or over objection, as to the book value of many items of such assets, indeed, so far as we observe, all which were not objectionable on other grounds. It also appears that the defendants introduced, in chief, schedules prepared by Coates as to the general assets, and made no attempt to examine him further as their own witness. The defendants' finding as to evidence offered also contains an itemized statement of assets on hand on the date of the appointment of the receiver. The defendants were accorded generous latitude as to this and other evidence claimed to tend to establish good faith in their course of conduct. The testimony of an attorney who acted as counsel for The Parker-Smith Company from about December, 1923, until the appointment of the receiver, called as a witness by the defendants, was properly limited to advice given pertaining to the segregated accounts and their use, to the exclusion of that concerning the general affairs and financial condition of the company, also as to conferences with the bank commissioner concerning the continuance of the operations of the company, the pro-

curing of new capital, and similar plans for its re-habilitation. The latter considerations were irrelevant, as was testimony of the same general nature sought from the attaches of the state banking department and others.

None of the rulings involve error which can fairly be regarded as harmful. Rarely, if ever, can studious and minute search of the record of a case of magnitude and complexity, tried, as was this, in extreme detail and with zeal and resourcefulness, fail to develop some point or ruling which may technically be open to question. We find none here which is not, at most, minor and inconsequential, and the defendants could not have been so prejudiced thereby as to warrant or suggest a new trial. Upon the intensive study to which we have subjected the record, we have been impressed by the noteworthy liberality accorded the defendants in many rulings and the marked fairness to them of the charge as a whole and the general conduct of the trial.

There is no error.

In this opinion the other judges concurred.