STATE OF CONNECTICUT *v.* JOHN R. GERICH ET AL.

BROWN, C. J., JENNINGS, BALDWIN, INGLIS and O'SULLIVAN, Js.

Argued June 13—decided August 14, 1951

*Thomas J. Birmingham* and *Samuel H. Aron,* with whom was *James F. Kennedy,* for the appellants (defendants Gerich, Seybold, Claude Brodeur and Ger-Ron Farms Corporation).

*Donald C. Fisk,* for the appellee (state).

O'SULLIVAN, J. The defendants Gerich, Seybold, Claude Brodeur and Ger-Ron Farms Corporation were found guilty of the crime of conspiracy to cheat and defraud. They have appealed. The principal question for determination, as stated in their brief, is whether the evidence supports the court's conclusion that they were guilty beyond a reasonable doubt. *State* v. *Guastamachio,* 137 Conn. 179, 183, 75 A. 2d 429; *State* v. *Cots,* 126 Conn. 48, 53, 9 A. 2d 138; *State* v. *Frost,* 105 Conn. 326, 332, 135 A. 446.

Since the trial of this case consumed twenty-four court days, any effort to detail the evidence would carry this opinion far beyond reasonable bounds. The following recital of salient facts, amply supported by the evidence, will suffice for our discussion: During the first half of 1944, Gerich, Seybold and Claude Brodeur, to whom we shall refer by his surname, formed a partnership to raise and sell turkeys, an enterprise in which Gerich was then engaged. They operated in this capacity until July 1, 1945, when they organized the defendant Ger-Ron Farms Corporation to take over the business. The three individuals became stockholders in the corporation to the proportionate extent of their interests in the partnership. Each served thereafter as an officer and director of the company.

The term "New York dressed" is applied to a turkey

which has been slaughtered, bled and plucked. Its weight, in that condition, is called "New York dressed weight." An eviscerated turkey is one upon which the above-described operations have been completed and from which the entrails, head and feet have been removed. Evisceration decreases the weight of the bird by 18 to 20 per cent.

In 1943, about six months before the partnership was formed, the federal office of price administration established ceiling prices for turkeys. For those which were eviscerated, the range was from 61 to 63 cents per pound retail, depending on the size of the bird, while the price for New York dressed was fixed at 54 cents. On several occasions thereafter, Gerich tried to persuade the O. P. A. officials to elevate the ceilings for the partnership on the ground that its processes for handling, wrapping and shipping turkeys were unusual and that the existing regulations made a reasonable profit impossible. In these efforts he was unsuccessful.

From the inception of their association together, first as partners and then as officers of the corporation, Gerich, Seybold and Brodeur billed the turkeys at New York dressed weight although the charges per pound which they made were those prevailing for eviscerated turkeys. The price of the latter was always higher than that of the former. The effect of this billing policy was that the purchaser was charged for at least 18 per cent more than the turkey weighed. This was not disclosed on the invoices received by the customer prior to February 1, 1945. Until that time, the only pertinent information appearing thereon was the number of turkeys sold to the buyer and the total price therefor. Subsequent to that date, a change was made in the billing. This was the result of a visit of O. P. A. inspectors. Upon examining the duplicate invoices, which disclosed only the information stated above,

the inspectors advised Gerich that future invoices should contain notations of the weights and per pound prices of the turkeys. Since the defendants' method of selling was violative of the O. P. A. ceiling regulations and in order to circumvent them, the defendants devised a secret markup code for the use of the billing clerks. The first column of the code listed New York dressed weights of turkeys ranging from 8 to 25¾ pounds. Then followed three double columns, one of which listed weights and the adjoining one, prices. Heading these columns were three numbers, 1, 4 and 7. Number 1 was for use when the charge was to be 70 cents a pound, and numbers 4 and 7, when the charge was to be 75 and 80 cents, respectively. The code was worked out as a speedy method of transposing the true weight of a turkey into the weight it would have to be, if billed at ceiling prices, to equal the price actually charged for it. For example, if a twenty-pound New York dressed turkey was billed at the ceiling price of 61 cents for eviscerated turkeys but was sold at an actual charge of 80 cents (or a total of $16), the code, under the number 7 heading, would list a weight of 26.3 pounds. The customer would then be billed for 26.3 pounds at 61 cents. Following the adoption of the code, the invoices, which were then sent out by the partnership and later by the corporation, carried on them in the lower left-hand corner three figures which previously had not appeared thereon. As applied to the example just cited, these figures would be "No. 824 — 26/3 — 61." The first would refer to the order number, the second to the weight and the third to the price.

Many customers of both the partnership and the corporation were manufacturing concerns which purchased large quantities of turkeys to be sent, during the holidays, as gifts to their customers and employees.

Other customers consisted of individuals who bought for their own use. Others were those operating restaurants, markets and clubs. During the period when O. P. A. regulations were in effect, almost all of the purchasers bought under the belief that ceiling prices governed their charges. Some of them paid no attention to the figures on the lower left-hand corner of the invoice. A few weighed the turkeys and found that they weighed less than the amount billed. The remainder, with few exceptions, made no effort to check the weights, relying on the honesty of the defendants.

When complaints were received that the turkey or turkeys did not conform with the weights, rebates were customarily returned to the purchaser. The defendants usually explained that the overcharge arose from a mistake by the billing clerk. An example of the effect of their scheme of operation is this one instance, typical of many: during September, 1945, the Harvard Club of New York City was billed for 2520 pounds but actually received only 1493 pounds. On the basis of the foregoing facts, which might be extensively supplemented, the court concluded that the defendants had entered into a conspiracy to cheat their customers and that the amount by which the latter had been defrauded exceeded $100,000.

The charge against the defendants was based on § 1447e of the 1939 Cumulative Supplement to the General Statutes (Rev. 1949, § 8876). The section provides that "Any person who shall combine, confederate or agree with another or others to accomplish any unlawful object by lawful means, or any lawful object by unlawful means, or any unlawful object by unlawful means, and, one or more of such persons shall do any act in furtherance of such combine, confederation or agreement" shall be punished.

The foregoing facts, many of which were supported

by documentary proof, established all of the elements of the crime. The gist of the offense was the agreement or mutual understanding to cheat and defraud. *State* v. *Bradley,* 48 Conn. 535, 550; *State* v. *Hayes,* 127 Conn. 543, 588, 18 A. 2d 895. There was no need to prove a formal agreement among the defendants. It was enough that they knowingly engaged in a mutual plan to do a forbidden act. *State* v. *Rich,* 129 Conn. 537, 540, 29 A. 2d 771; *State* v. *Kemp,* 126 Conn. 60, 79, 9 A. 2d 63. Conspiracy can seldom be proved by direct evidence. It may be inferred from the activities of the accused persons. *State* v. *Faillace,* 134 Conn. 181, 185, 56 A. 2d 167. From the very nature of the crime, the corrupt and usually secret agreement or understanding can only in rare instances be established otherwise than through the use of circumstantial evidence. *State* v. *Thompson,* 69 Conn. 720, 726, 38 A. 868; *State* v. *Spalding,* 19 Conn. 233, 237. The evidence overwhelmingly supports the existence of an agreement or mutual understanding in the case at bar, as well as the active participation of all the defendants in carrying it out.

Cheating and defrauding was the object of the conspiracy, and false and fraudulent billing was the means employed. The object was clearly unlawful. *State* v. *Gannon,* 75 Conn. 206, 212, 52 A. 727. The same may be said of the means, for, if the acts which the defendants did were corrupt, dishonest and fraudulent, as they obviously were, they were unlawful. *State* v. *Parker,* 114 Conn. 354, 360, 158 A. 797. " 'Cheat and defraud' includes every kind of trick, device, artifice, or deception from false representation and intimidation to suppression and concealment of fact or information, used for the purpose of depriving another of his property or other known right contrary to the plain rules of common honesty." *State* v. *Parker,* supra, 362.

The deception practiced by the defendants lay not only in the concealment of information on the invoices, prior to February, 1945, as to the true weights and pound prices of the turkeys, but after that date, in the use of symbols in the lower left-hand corner of each invoice which were obviously false and which, if understood at all by the customer, were intended to lull him into the belief that they indicated the accurate weights at ceiling prices.

The defendants' final claim is that, if there was a conspiracy at all, it was one to circumvent price regulations of the office of price administration. This ignores the evidence upon which the court based its conclusion of guilt. The evidence which they overlook proved that their intention was to defraud their customers. The illegality of that objective was not affected by the fact that they also intended to get around the system of price controls. Conspirators may have more than one unlawful purpose in mind. It was ample if the state established the specific unlawfulness charged in the information.

A careful examination and consideration of the lengthy record satisfy us that the court was justified in finding the defendants guilty.

There is no error.

In this opinion the other judges concurred.