STATE OF CONNECTICUT *v.* T. FRANK HAYES ET ALS.

MALTBIE, C. J., AVERY, BROWN, JENNINGS and DICKENSON, Js.

Argued November 12, 19 and 20, 1940—decided March 4, 1941.

*George W. Crawford,* with whom, on the brief, was *Nathan Shepatin,* for the appellant (defendant Alderman).

*Samuel A. Persky,* for the appellants (defendants Minor and Johnston).

*John H. Cassidy,* for the appellants (defendants O'Connor, Healey and Santalucia).

*Benjamin Slade,* for the appellants (defendants Kingsley and Meany).

*Albert W. Hummel,* with whom, on the brief, was *George H. Lynch,* for the appellant (defendant Fleming).

*Frederick H. Waterhouse,* for the appellant (defendant Leary).

*William J. Wholean,* for the appellant (defendant Dunn).

*Sidney S. Cassel,* for the appellant (defendant Coppeto).

*Thomas F. McDonough,* for the appellant (defendant Kelly).

*James D. C. Murray,* of the New York bar, with whom, on the brief, was *Joseph F. Murray,* for the appellant (named defendant).

*Hugh M. Alcorn,* special state's attorney, and *Hugh Meade Alcorn, Jr.,* with whom was *Harold E. Mitchell,* special assistant state's attorneys, for the appellee (state).

MALTBIE, C. J. While this opinion is handed down under the name of the chief justice, it should be stated that it is the result of collaboration on the part of all the members of the court to an unusual degree.

On May 19, 1938, an information was filed against the following defendants: Thomas Francis Hayes, also known as Frank Hayes and T. Frank Hayes, Daniel J. Leary, Carl D. Olsen, Thomas P. Kelly, Thomas J. Fleming, Martin J. Dunn, Charles S. O'Connor, John H. Crary, Thomas A. Shanahan, Michael F. Slavin, Philip Coppeto, Ralph Coppeto, Timothy J. Horgan, Frank A. Santalucia alias Frank Burns, James P. Healey, Henry Minor, all of Water-

bury; Harry E. Mackenzie of Bethel; Charles E. Williamson of Darien; Edward G. Levy and Simon J. Alderman of New Haven; Donato Pietraroria alias Dan Peters of Bristol; John G. Purdie alias John Conway, John S. Johnston, George H. Kingsley, William R. Murray, John B. Meany and Enoch Borgnaes, all of New York. These defendants will hereinafter be referred to by their surnames. The information charged that they, with others, combined, confederated and conspired together between January 1, 1930, and May 19, 1938, to cheat and defraud the city of Waterbury and the residents and taxpayers thereof, and to violate several provisions of the charter of the city and of the statutes. The information covers twenty-five printed pages in the record, states in great detail the methods alleged to have been used by the various defendants in the prosecution of the conspiracy and alleges that as a result the city of Waterbury was defrauded of more than one million dollars.

Hayes was elected mayor of Waterbury in October, 1929, and by virtue of reelections he held the office up to and after May, 1938. Leary was elected comptroller of Waterbury in October, 1929, and by virtue of reelections held the office until January 3, 1938; in October, 1937, he was defeated for reelection by Sherwood L. Rowland, who on January 3, 1938, assumed the duties of the office of comptroller. Kelly was executive secretary to the mayor during the latter's term of office, and occupied a close relationship of confidence to him. Fleming was superintendent of streets from January 19, 1931, to May 19, 1938, was an appointee of Hayes and by virtue of his position was called upon to approve large payments to contractors and others. Dunn was employed in the comptroller's office when Leary was elected and continued there during the period in question; he was designated as purchasing agent and

from time to time as deputy comptroller; he was at all times under the direction, supervision and control of Leary. O'Connor had been corporation counsel for some time prior to January 1, 1930, and held that office during the period in question by virtue of appointment and subsequent reappointment by Hayes. Crary and Shanahan were assessors and were elected and reelected throughout the period of the conspirary; the annual salary of each was fixed by the charter at $3100 per year. Horgan, an appointee of Hayes, was superintendent of the city hall.

Philip Coppeto was the owner and operator of a small trucking business, variously designated as Phil Coppeto, P. Coppeto and the Abrigador Digger. Santalucia was the operator of a grille in Waterbury and also claimed to be the owner and operator of a trucking business conducted under various names such as Frank Santalucia, F. Santalucia and Frankie Burns, and during the latter portion of the period as the Connecticut Supply Company. Healey was the treasurer of the H. W. Connor Company, an established trucking concern located and doing business in Waterbury. Pietraroria was a resident of Bristol, where he operated a tavern. Very large sums of money were paid to these men during the course of the conspiracy which the state claims did not represent any materials or service furnished to the city by them.

Olsen was vice president and treasurer of the Waterbury Trust Company, of which Leary was a director and one of the largest stockholders, during the period covered by the information. Minor, during the period, was an inactive member of the bar employed at the office of the Diamond Ginger Ale Company, a business corporation controlled by Leary. Mackenzie was a resident of Bethel and Williamson was an active member of the bar residing in Darien; both were active and

influential in Republican politics in Connecticut and from time to time engaged in lobbying activities in the General Assembly, especially during the sessions of 1935 and 1937, where they were employed by Hayes and Leary as hereinafter stated. Levy was an active member of the bar practicing in New Haven. Alderman was an accountant having his home and place of business in New Haven; from time to time he was employed as an accountant by the city of Waterbury, by Hayes, Olsen and Santalucia, and was also employed by Leary to do work in the Diamond Ginger Ale Company and the Waterbury Brewing Company, enterprises controlled by Leary. Purdie was a resident of New York and was employed by Hayes and Leary, the state claimed, to secure information for the purpose of preventing the disclosure of the conspiracy and of aiding in the concealment thereof. Johnston was a resident of New York and received large sums of money from the city which he claimed were in payment of services rendered in marketing bonds and securing temporary loans. Kingsley, Meany and Borgnaes were accountants having their principal office in New York; they were partners in or employees of Kingsley & Company, which, during the greater portion of the period in question, were employed to audit the books, records and accounts of the city.

On motion of Ralph Coppeto, Murray and Slavin, they were discharged by the court. Borgnaes has been a fugitive from justice since the date of the information. Horgan pleaded nolo contendere. Levy and Mackenzie pleaded guilty and with Williamson, who elected trial by the court, were witnesses for the state. Alderman, Kingsley and Meany were the only defendants who took the witness stand in their own defense to offer any denial or explanation of the charges against them.

All of the defendants except Ralph Coppeto, Murray, Slavin and Borgnaes were convicted. Crary, Shanahan, Mackenzie, Williamson, Pietraroria and Purdie have served or are serving their sentences. Judgment was suspended in the case of Horgan. Olsen appealed but abandoned his appeal. The remaining defendants Hayes, Leary, Kelly, Fleming, Dunn, O'Connor, Santalucia, Healey, Philip Coppeto, Minor, Johnston, Alderman, Kingsley and Meany appealed from the denial of certain preliminary motions, from the overruling of pleas in abatement, from the judgment, from the denial of their motions to set aside the verdict as against the law and the evidence and also filed motions in arrest of judgment. We shall first consider the denial of the motions to set aside the verdict as against the evidence.

Before discussing the evidence in the case, certain principles of law necessarily involved in the decision to which we come should be stated. The question before us is not whether, upon the evidence, we would reach the same conclusion as did the jury, but if the verdict is "one which twelve honest men, acting fairly, intelligently and reasonably, might have rendered, we cannot set it aside. If, on the other hand, we find it does manifest injustice, and is so palpably against the evidence as to indicate that the jury must have made some mistake in the application of legal principles, or were influenced by lack of knowledge or understanding, or by corruption, prejudice, or partiality, we will set it aside." *State* v. *Chin Lung*, 106 Conn. 701, 704, 139 Atl. 91; Conn. App. Proc., §§ 113, 114. The record fails to indicate that the defendants had otherwise than a fair trial or that the jury were affected in any way by prejudice or influenced by the notoriety attending or the public interest in the case. The state moved for a change of venue but this was opposed by the de-

fendants. Two months were taken in the examination of jurors upon their voir dire and the challenges to which the defendants were entitled were not exhausted, so that they secured a jury the members of which were acceptable to them. The action of the trial court in denying the motions to set the verdict aside is, in a matter of this kind, entitled to great weight for it was in a great deal better position to pass upon the question than we are. *State* v. *Laudano,* 74 Conn. 638, 646, 51 Atl. 860; Conn. App. Proc., § 114 (c). There being nothing to indicate a prejudice on the part of the jury or improper influence affecting them, the verdict (as stated in *State* v. *Chin Lung,* supra, 705), cannot be set aside if there is any reasonable ground appearing in the evidence upon which the jury might have reached their conclusion.

The defendants were entitled to the benefit of the presumption of innocence but the effect of that presumption is limited to the imposition of the burden of proof of guilt beyond a reasonable doubt upon the state and it is not evidence. *State* v. *Gardner,* 112 Conn. 121, 123, 151 Atl. 349; *O'Dea* v. *Amodeo,* 118 Conn. 58, 60, 170 Atl. 486. It is also true that "any conclusion, reasonably to be drawn from the evidence, which is consistent with the innocence of the accused, must prevail"; *State* v. *Guilfoyle,* 109 Conn. 124, 139, 145 Atl. 761; but that does not mean that if some of the circumstances proven were capable of an explanation consonant with the innocence of the defendants, the jury were bound entirely to disregard them; "If the jury could reasonably have reached the conclusion that the cumulative effect of the facts they found proven established the guilt of the accused beyond a reasonable doubt the verdict must stand, though the evidence was wholly circumstantial." *State* v. *Olavieri,* 123 Conn. 678, 679, 195 Atl. 181; *State* v. *Gallivan,* 75 Conn. 326,

331, 53 Atl. 731. The jury were entitled to draw any reasonable inferences from the facts in evidence; *Kinderavich* v. *Palmer*, 127 Conn. 85, 87, 15 Atl. (2d) 83; and it is not true, as the defendants claim, that the jury may not base one inference on facts they find as the result of other inferences; *Sliwowski* v. *New York, N. H. & H. R. Co.*, 94 Conn. 303, 310, 108 Atl. 805; *Ruerat* v. *Stevens*, 113 Conn. 333, 338, 155 Atl. 219; our inquiry is limited to ascertaining whether the inferences are so unreasonable as to be unjustifiable. *Saunders* v. *New England Collapsible Tube Co.*, 95 Conn. 40, 44, 110 Atl. 538; *Ruerat* v. *Stevens*, supra.

The state was unable, in this case, to produce direct evidence of the conspiracy and relied on evidence of a large number of transactions, showing a similarity of plan and purpose and from which it claimed that the existence of the conspiracy could be reasonably inferred. "The proof of this [conspiracy] is not often made, by direct, open and positive evidence; but more generally and more naturally, by proving a repetition of acts of a character conducing to show a mutual purpose. In such case, it is seldom true, that any one act, taken by itself, can be detected as tending to prove a combination; but when it is seen in connexion with other acts, its true nature may be discovered. And so, as this species of proof is multiplied, a strong case of unlawful conspiracy is often established." *State* v. *Spalding*, 19 Conn. 233, 237; *State* v. *Murphy*, 124 Conn. 554, 564, 1 Atl. (2d) 274; *Reg.* v. *Murphy*, 8 Car. & P. (Eng.) 297, 310; *Commonwealth* v. *Warren*, 6 Mass, 73, 75; *Commonwealth* v. *McClean*, 2 Pars. Eq. Cas. (Pa.) 367, 368; *People* v. *Looney*, 324 Ill. 375, 384, 155 N. E. 363; 2 Wharton, Criminal Law (12th Ed.) § 1667.

The principal claim of the defendants is that, even giving to the evidence offered by the state its utmost

probative value, it can be said to have proved no more than that some or all of these defendants had a similar underlying object to defraud the city which they accomplished through separately planned conspiracies, each complete in itself. If that were so the defendants could not properly be convicted. *Terry* v. *United States*, 7 Fed. (2d) 28; *Tinsley* v. *United States*, 43 Fed. (2d) 890. In the cases of *United States* v. *Siebricht*, 59 Fed. (2d) 976, and *People* v. *Suffolk Contracting Co.*, 157 N. Y. S. 523, relied upon by the defendants, the court applied this principle to states of fact sufficiently different from that before us effectively to distinguish them. It is necessary to distinguish between the conspiracy or illegal agreement itself and the crimes or other acts done in pursuance thereof. As Justice Holmes put it in *Frohwerk* v. *United States*, 249 U. S. 204, 209, 39 S. Ct. 249, 63 L. Ed. 561: "Countenance we believe has been given by some courts to the notion that a single count in an indictment for conspiracy to commit two offenses is bad for duplicity. This court has given it none . . . The conspiracy is the crime, and that is one, however diverse its objects." The parties may not know each other; *Allen* v. *United States*, 4 Fed. (2d) 688, 691; as long as they act in furtherance of the objects of the single conspiracy, knowing of its existence and intending to aid it, this fact, while not irrelevant, would not be conclusive. 1 Wharton, Criminal Evidence (11th Ed.) p. 288. They may have engaged in only a part of the activities of the conspirators. *Mendelson* v. *United States*, 58 Fed. (2d) 532, 535; *Coates* v. *United States*, 59 Fed. (2d) 173, 174. Provided the common design, ever leading to the same unlawful result, is proved, none of these things are of any importance. *Lefco* v. *United States*, 74 Fed. (2d) 66, 68. Here a general conspiracy was alleged. Whether it was proved or

whether a number of separate conspiracies were proved was a question for the jury under proper instructions. *United States* v. *McConnell*, 285 Fed. 164, 167.

The jury could reasonably have found from the evidence the following facts: The main purpose of the conspiracy was to defraud the city of Waterbury of a very large sum of money and the case was tried by the court and by counsel on that theory. That is the issue with which we are primarily concerned. The activities of the defendants roughly resolve them into three groups. Hayes, Leary, Kelly and Olsen formed the principal and original group and while their activities permeated the entire conspiracy, they were principally directed to the obtaining of money from the city treasury. Assisting them as men whose cooperation and silence was essential to success in this effort were Dunn, Fleming, Crary and Shanahan. The second group were designated by the special state's attorney as "feeders." It consisted of Coppeto, Santalucia, Healey, Mackenzie, Williamson, Levy, Minor, Johnston and Pietraroria. They were all men whose positions and occupations gave some semblance of plausibility that the bills rendered by them or the payments made to them were based on valid considerations, although the payments were out of all proportion to the services rendered and sometimes entirely gratuitous. In order to retain their cooperation and silence they were allowed to keep some portion of the city moneys disbursed to them but a large part was turned over to the members of the first group. The third group was principally engaged in endeavoring to conceal the existence of the conspiracy, both during its progress and after its collapse. It included Purdie, Horgan and Borgnaes and the members of the first mentioned group.

The general methods of operation of the conspirators

may be illustrated by certain typical instances. It would serve no useful purpose and would be impracticable to review the entire evidence within the reasonable limits of this opinion.

Levy was the first "feeder" employed by the central group. He contacted Hayes and Leary concerning a survey of the city of Waterbury to ascertain whether savings could be effected in the use of electric light and power. At the request of Hayes the board of aldermen authorized him to enter into a contract with a partnership known as George Browning, Incorporated, consisting of Levy and George Browning, for the purpose of reducing the light rates of the city. Before this contract was entered into, Leary arranged with Levy and Browning that one-half of the sums paid to the latter under the contract would be "kicked back" to Kelly, who was to handle the matter thereafter. Certain payments were made thereunder and "split" as agreed and in May, 1932, a release of the contract was arranged for between Levy and Kelly. Kelly produced a check payable to George Browning, Incorporated, in the amount of $4200, which was cashed by Olsen for Browning and Levy at the Waterbury Trust Company. Kelly gave Levy $2200 and retained for himself, Hayes, Leary and Olsen $2000. After the release of this contract a new arrangement was entered into between Levy and Kelly whereby Browning was eliminated and Levy was to retain approximately 25 instead of 50 per cent of the cash paid to him and would "kick back" the other 75 per cent. Levy did not pretend to do any work or perform any services for the city thereafter but received many payments under this arrangement aggregating a very large sum of money.

The details of one of these transactions were as follows: On or about January 3, 1934, Kelly telephoned Levy requesting him to come to Waterbury to the office

of the mayor. When Levy arrived, Kelly produced a check of the city of Waterbury signed by Leary and payable to Levy in the amount of $6300, which check Levy, at Kelly's request, indorsed. Shortly thereafter, pursuant to a plan prearranged with Kelly, Olsen came to the office of the mayor from the Waterbury Trust Company with $6300 in currency which he exchanged for the indorsed check. Kelly thereupon gave Levy $1000, retaining the balance for himself, Hayes, Leary and Olsen, none of whom had rendered any services in return for this payment. The check was unnumbered when issued, was never approved by the board of finance and although it was paid on January 3, 1934, no record of this payment was made upon the books of the city until March 16, 1934. This method of bookkeeping was practiced not only in this instance but in most instances of fraudulent payments with the knowledge, consent and approval of the men comprising the first group for the purpose of concealing from the board of finance and the citizens and taxpayers of Waterbury information concerning such payments and for the purpose of preventing later discovery of or disclosure concerning such payments. While the general situation in Waterbury was being investigated by the special grand jury, Levy became very much concerned because of the danger of a prosecution by the federal government for failure to report the payments to him in his income tax return. When this became apparent to the principal conspirators, he was furnished by them with false information to give to the grand jury, was paid $8000 in cash for his silence and was promised the cooperation of Hayes and Leary in preventing a prosecution by the federal government for failure to make a proper income tax return.

Another of the general methods of operation may be illustrated by the dealings with Pietraroria, who was

a tavern keeper in Bristol and had no equipment or contracting business of any kind. Regular payments were nevertheless made to him purporting to be for truck hire, aggregating for the years 1932 to 1935 $72,009, of which he was allowed to retain $35 a week. While there were variations in each individual case, the payments to Coppeto, Santalucia, Healey, Minor and Johnston followed the Pietraroria pattern, while those to Mackenzie and Williamson were similar to those made to Levy.

In the case of Levy there was definite evidence of a "kick back" of 50 and later 75 per cent of the amount received and in the cases of Williamson and Mackenzie the "kick back" was generally 50 per cent. In the cases of Coppeto, Santalucia and Healey, while there was no direct evidence of the "split," it followed the pattern of the Pietraroria payments and only a small amount of the total received by them was deposited in their accounts. The checks were in general either cashed by Olsen at the Waterbury Trust Company or were there exchanged by him for treasurer's checks, thus making it impossible to trace the ultimate recipient of the money. The magnitude of the operations will appear from the following summary of the total payments from the city treasury to these several defendants:

| Name | Amount |
|---|---|
| Hayes | $ 6,417.75 |
| Hayes (entertainment by) | 925.55 |
| Leary | 6,851.85 |
| Kelly | 4,252.00 |
| Coppeto (Arbigador Digger) | 765,335.21 |
| Coppeto (personal) | 37,178.22 |
| Santalucia | 295,342.19 |
| Pietraroria | 72,009.00 |
| H. W. Connor Company | 40,253.47 |
| Connecticut Supply Company (all but about $30,000 of which in the years 1935 and 1936) | 294,773,69 |

| | |
|---|---:|
| Levy | 130,907.00 |
| Williamson (and Mackenzie) | 34,000.00 |
| Purdie | 3,699.30 |
| Minor | 12,890.00 |
| Johnston | 211,247.06 |
| Total | $1,916,082.29 |

This does not include large sums claimed by the state to have been fraudulently paid to others and includes only those payments which the state has been able to trace. While the direct payments to Hayes and Leary were comparatively small, none of them appeared to be proper charges against the city.

After the defeat of Leary for reelection in October, 1937, other defendants actively entered the picture and, assisted by the main group, frantically endeavored to conceal the peculations. That fall there occurred three highly relevant fires. Fleming caused practically all of the duplicate vouchers for work in the street department to be burned. Olsen burned the paying teller's sheets which contained the only record at the Waterbury Trust Company of the names of the payees of city checks cashed at that bank. The big fire was in the city hall where the contents of ninety-nine transfer cases containing most of the city checks and vouchers for the period in question were burned by direction of Leary, by Dunn, Kelly, Horgan and various assistants not defendants here. In addition, just before the new comptroller took office, the warrants payable sheets for 1936 and 1937, together with many previous pages from the warrants payable sheets register and other important city records, disappeared and have not been found.

Purdie had secured undisclosed information concerning many prominent citizens of Waterbury who were active in exposing this conspiracy. Leary threatened a representative of this group with the publication of

these statements unless the investigation was stopped and the complaints withdrawn but the investigation went on. Hayes and Kelly labored with Levy as above set forth and Leary endeavored to secure the cooperation of Mackenzie and Williamson as to their testimony given before the grand jury.

This destruction and suppression of evidence made the work of the prosecution very difficult. The fact that any information at all could be obtained was due in large part to the cooperation and prevision of the chief accountant in the comptroller's office, Purcell. When Leary took office there was a vacancy in this position and he appointed Purcell, who had very limited experience in this work. In spite of this he soon noticed irregularities in office procedure but when he attempted to complain of them to Leary and to the mayor he was told in effect that he did not understand politics, to mind his own business and to do as he was told. Thereafter he kept and retained under his personal control copies of many of his working papers, including copies of bank reconciliation statements and adding machine tapes. These were available at the time of trial and in spite of attempts by Leary to buy his silence, they were produced by him for the use of the state. It was with the assistance of these papers in connection with such other records as were available that the expert accountant for the state was able to trace the payments to the extent indicated.

The destruction of the warrants payable sheets made it extremely difficult to trace many disbursements made from the city treasury. The charter of the city required that all disbursements to be made by the city, with a few exceptions, principally pay roll payments, should be submitted to the board of finance and approved by it. These sheets listed the disbursements to be made, with sufficient particularity so that the pur-

pose for which they were to be made and the appropriations against which they were to be charged could be at once determined, and they were the only records of the city which served that purpose. On the back of each sheet was a certificate to be signed by members of the board, in which were blank spaces for inserting the numbers of the warrants listed on it which were approved by them. While warrants payable sheets were submitted to the board, on which were listed most of the disbursements to be made by the city, the members performed their duties in a very perfunctory way and failed to cause the certificate to be filled out. Many entries were inserted on these sheets after they had been submitted to the board; among these were a large part of the payments to the defendants which we have listed; and of these the members of the board had no knowledge.

There was evidence from which the jury could have found that the general conspiracy was formed by the original central group consisting of Hayes, Leary, Kelly and Olsen who remained in control of its operations throughout. This group might be compared to the head of an octopus. At different times it associated with itself the other defendants (the arms of the octopus) whose cooperation was of different kinds but always was in furtherance of the single conspiracy. The arms might not help or be associated with each other but were always attached to and endeavored to forward the purposes of the head. This being so, the next question as to each of the appealing defendants is, was he connected therewith by evidence in such a way as to support the verdict of guilty rendered by the jury?

As stated by the trial court in its charge, "The minimum which the state must prove as against any one of the defendants in order to make out a case against

him is that he did some act which actually was in furtherance of the purposes of the general conspiracy and that when he did it, he had a guilty intent and knew that what he was doing was, not so much an isolated act, but rather a part of some general scheme to defraud the city or commit some of the other unlawful acts alleged in the information." *State* v. *Murphy*, 124 Conn. 554, 565, 1 Atl. (2d) 274; *Lefco* v. *United States,* 74 Fed. (2d) 66, 68.

The Waterbury charter is a so-called "strong mayor" charter of an extreme type. The mayor was not only the titular head of the city government but the actual head in direct control of almost all of its departments and officers. Hayes made full use of his opportunities along these lines and while he obviously could not know of every administrative detail, his interests in and connection with the operations of the city government were intimate, continuous and aggressive. At the very inception of the conspiracy he reprimanded Purcell, participated in the hiring of Levy, and his connection with the latter's operations, including the attempt to procure his silence or cooperation during the investigation, was such as to justify an inference that he was participating in the "kick backs." In 1935 and 1937, in addition to being mayor of the city and prominent in state politics, he was lieutenant governor of the state and presiding officer in the senate. He participated in the hiring of the lobbyists Mackenzie and Williamson and directed their activities personally throughout both sessions. As chairman of the board of finance, as well as mayor, he must have known of the size of the payments to various favored contractors and the methods used to conceal those payments.

The illustrative instances already discussed are ample to connect Leary and Kelly with the conspiracy.

The size of the payments made to Coppeto, Santa-

lucia and Pietraroria, the facts that they had little or no equipment with which to do the work for which they were supposed to be paid and that most of the city checks given to them were not deposited in regular bank accounts but were either cashed by Olsen or exchanged for treasurer's checks of the bank, so that the payments could not be traced, are strong circumstances indicating participation in the conspiracy. While no payments were made by the city directly to Healey, he was treasurer of the H. W. Connor Company and large sums were paid to it. It is true that this company was an established trucking concern, owning a considerable amount of equipment. During the period of the conspiracy, payments amounting to $40,253.47 can be traced as having been made to it. During the years 1930 to 1933, the payments amounted to a total of only a little over $2000, but in the year 1934 alone $17,697 was paid to it, and the total payments in that year and in 1936 and 1937 amounted to $37,703.25. While the company had a commercial account in another bank, more than $32,000 of this sum was not deposited in that account but the checks were either cashed at the Waterbury Trust Company or exchanged for treasurer's checks and only a small amount of the money received was entered upon the company's books. The similarity of the operations in connection with the company to those of Coppeto, Santalucia and Pietraroria and the fact that Healey was the person directly responsible in connection with dealings with the company, affords strong support for the conclusion of the jury that he was guilty. Fleming, as superintendent of streets, approved many of the fraudulent bills of the contractors and the jury might reasonably have found that Dunn, as deputy comptroller and purchasing agent, must have known of these transactions and of the method used in making the payments.

Moreover, Fleming was responsible for the fire previously referred to, in which the papers of the street department concerning the employment of contractors were burned, and Dunn participated in the burning of the contents of the cases containing the city checks and vouchers for the period of the conspiracy.

Minor was an intimate of Hayes and Leary. He had an office at the Diamond Ginger Ale Company, one of Leary's enterprises, and was a police commissioner of the city. Between August 5, 1936, and July 16, 1937, he received seven city checks amounting in the aggregate to $12,890. A voucher for one of the payments states that the services were "re industrial relations, etc., investigation of various city departments, accounts, methods of procedure, suggestions for improvements"; and two others are of a similar tenor. The nature of these claimed services was largely such as would ordinarily be performed by accountants, and Minor was not a qualified accountant. Some, at least, of the payments made to him were added to the warrants payable sheets after they had been approved by the board of finance. The checks received by him were cashed or exchanged for treasury checks of the bank by Olsen, as were those paid to the contractors, whose cases we have discussed. He met with Leary and other defendants several times during the investigation. At least some of the payments made to him never were submitted to the board of finance. Aside from the statements on the vouchers, there was no evidence that he had in fact performed any services for the city. The amounts paid, the nature of the charges as stated in the vouchers, and the similarity of the way in which the matter was handled to that in the case of the payments to the contractors we have described, afford strong evidence that Minor was a participant in the conspiracy.

Johnston was an intimate of Leary. At one time he was president of the Steam Sterilizer Company, in which Leary was also greatly interested, and which was a company for which Williamson acted as lobbyist. During the period of the conspiracy Johnston received more than $200,000 from the city treasury. The checks were paid at frequent intervals; they varied in amount but, with few exceptions, the sums were between $2000 and $10,750; and the amounts averaged considerably higher during the later portion of the period. He had accounts in banks in New York, and until the latter part of 1934 the checks he received were usually deposited in those accounts; when each was deposited, there was only a small balance in the account, the largest sum being $405.60; and in each instance within a very few days thereafter a very substantial sum was withdrawn in a single transaction. Beginning in December, 1934, he presented the checks he received at the Waterbury Trust Company and received cash or part cash and part in treasurer's checks usually signed by Olsen, and deposited either none of the money or only a portion in his bank accounts. The payments made to him were usually charged against an appropriation for interest on floating debt. Johnston ostensibly performed services in connection with the disposal of bonds by the city and the securing of loans for it. While undoubtedly during the period the city made certain large issues of bonds and secured temporary loans, the fact that the payments to Johnston were often made at frequent intervals, in some cases twice a month, and that in one instance two checks each for $9000 or more were issued on the same day, might well give rise to a question whether there was any relationship between the payments made to him and the issuance of bonds or the securing of loans by the city. The board of finance would naturally be con-

cerned with these matters, but one member, who had been rather regular in his attendance at its meetings, except for periods in the winter, knew nothing about the payments made to Johnston. There was very little evidence to substantiate a claim that Johnston performed any services for the city and none that indicated in the least the extent of those services. The only evidence connecting Johnston with any established concern engaged in the business of marketing bonds was that during the later portion of the period he was an employee of a brokerage firm in New York, but few payments made to him could be traced to it. The jury might well have found that he did perform some services for the city; but they could reasonably conclude that the great bulk of the payments made to him did not represent services actually performed, but were made in pursuance of the conspiracy.

None of these defendants took the stand. While it is true that they were under no legal obligation to do so, the jury, in weighing the evidence, were entitled to draw an unfavorable inference from their failure to testify. *State* v. *Ford,* 109 Conn. 490, 496, 498, 146 Atl. 828; *State* v. *Heno,* 119 Conn. 29, 34, 35, 174 Atl. 181; 94 A. L. R. 701; 8 Wigmore, Evidence (3d Ed.) §§ 2272, 2272a. As regards these defendants, we cannot hold that a refusal to set the verdict aside was erroneous as a matter of law.

There remain four defendants. One of them, O'Connor, did not take the stand, and the other three, Alderman, Kingsley and Meany, all of whom were accountants, testified at length and offered extensive corroborative testimony.

O'Connor, as corporation counsel of the city, was by the charter charged with the duty of attending to most of the legal matters concerning the city, and if directed by the mayor or board of aldermen, of represent-

ing the city in all matters affecting the city pending before the General Assembly, and he was authorized, if in his opinion the interests of the city required, to employ, with the consent of the mayor, additional counsel to represent him. His office in the city hall adjoined that of the mayor, with a connecting door, often open. There is no evidence that he was ever directed to appear before the General Assembly or that he knew of the employment of Williamson or Mackenzie. During the period of the conspiracy large sums of money were paid to other attorneys for legal services to the city and while no evidence indicates their direct employment by him, he undoubtedly did know of it. He received a salary fixed by the charter at $6000 a year, and in addition, various other sums, but, upon analysis, these are found to consist of payments made to a revolving petty cash fund of $400 a year allotted to his office, for which he accounted each year, certain payments made, so far as the evidence shows, to reimburse him for expenditures in connection with legal matters affecting the city, certain allowances to him for expenses in connection with such matters, and three items amounting to $2340 which the evidence does not explain. The checks to him were made payable to him as corporation counsel or as "custodian." While many of these payments were not charged against proper appropriations in the comptroller's office, there is no evidence that he had any knowledge of this; nor is there sufficient evidence that he ever personally received any funds to which he was not properly entitled, aside from certain items for expenses and those which are left unexplained. The evidence leaves it uncertain what the nature of the expenses were and on the face of the papers, the sums seem excessive for the purpose indicated in certain of the vouchers representing them. The total of the ques-

tionable payments is very small compared to the sums illegally obtained to which we have previously referred. As far as appears, he had no dealings with Olsen or the Waterbury Trust Company. On the whole we cannot find any basis in the evidence for a reasonable inference on the part of the jury that he was a party to the conspiracy or did anything, with knowledge of it, of an incriminating nature. The evidence fails to afford support for the verdict of guilty rendered against him.

Alderman had been the accountant for certain corporations in which Leary was heavily interested and had done some personal work for Hayes and Leary on their income tax returns and for two of the other defendants. When, in 1930, Purcell was engaged as accountant in the comptroller's office, Leary employed Alderman to assist Purcell in getting started. Alderman testified that subsequently he did a large amount of work for the city in the nature of auditing, in organizing methods of operation in certain departments and in securing the settlement of claims for and against the city, particularly in connection with the welfare department, and this was strongly substantiated by the testimony of several witnesses employed by him, most of whom had assisted at one time or another in the work. The checks he received from the city in payment were deposited by him in his regular account. After Leary's defeat in the election in October, 1937, he called Alderman from work he was doing elsewhere and employed him in part to audit certain departments in the city and in part for the purpose of securing a statement of the city's financial position before Leary left office. As to the latter work, Alderman testified that Leary promised to pay him personally because it was work which fell within the scope of that being done by the regular city auditors. Alderman worked

on the books until the end of December and continued into January in assembling the data he had secured. For the work done in auditing the departments he was paid by a check of the city made out on December 31st in the comptroller's office in his presence, which he took to Leary for his signature at the office of the Diamond Ginger Ale Company. While at that time his work had not been completed, his charges involved an estimate of what would further be required. For the work done personally for Leary, he was paid by the latter's check in February, 1938. Leary had requested a list of all checks payable to him during the years 1936 and 1937, and for the purpose of making that list Alderman consulted the warrants payable sheets for 1936. The work he was doing for Leary required him to go over the warrants payable sheets and the checks for 1937. He had access to the vault where these and also the warrants payable sheets for previous years were kept, and as he was working at other than regular business hours, he had a key admitting him to the offices. In the course of his work some sheets were taken from the loose leaf binder for 1937 in which they were kept. Alderman testified, however, that all sheets taken out were replaced and all records he used were restored to the vaults, and witnesses called by him gave substantial corroboration. He was one of the last persons, so far as the testimony produced by the state shows, to have possession of the warrants payable sheets previous to the time when Leary's successor took office. There was no basis upon which the jury could reasonably find that Alderman did not perform the work for which he charged the city, and his method of depositing checks in his regular accounts was at variance with the way in which most of the defendants whose cases we have discussed treated the checks they received from the city. The method of paying him for

the work he did for the city on the last day of 1937 finds reasonable explanation in the fact that he had been employed by Leary and that it was the last day of Leary's term of office. Any inference that he was the one who removed the warrants payable sheets which were missing, loses weight in view of the fact that there was no testimony that he had anything to do with those sheets for other years than 1936 and 1937, whereas many of the missing sheets were for periods previous to 1936; while the jury might have found that he had the opportunity to remove these sheets for the latter periods, others of the defendants had an equal or better chance to do so. Alderman placed in evidence all his records and was extensively cross-examined. On the whole case we hold that there was insufficient evidence to justify his conviction and that it was error to deny his motion to set the verdict aside.

Kingsley & Company, a partnership located in New York, were employed as auditors for the city during almost the entire period of the conspiracy. It was an established auditing firm; in 1931 it had sixteen offices scattered over a large part of the country; thereafter, by a rearrangement, it had two offices, one in New York and one in Boston, and the former offices acted merely as its representatives. Kingsley was the senior member of the firm and Meany was chief accountant or supervisor until almost the end of the period, when he became a partner. Kingsley had held office in numerous national and local accountancy organizations, and for six years was secretary of the New Jersey state board of examiners in accountancy. The firm made each year a general audit of the finances of the city and did much work, also, of a more special nature, auditing particular departments, in connection with the tax assessors' office and with the laying of assessments and the like. It received in the aggregate more than

$100,000 from the city and much of this sum was in excess of the amounts appropriated directly for auditing. There was, however, no evidence from which the jury could reasonably find that the services for which payments were made were not actually performed, and there was strong evidence to the contrary. There was no evidence of any unusual method on the part of the firm in dealing with the checks it received. It had several employees working at Waterbury, and one of them, Borgnaes, was, at Leary's request, early in the period assigned to the city and thereafter devoted all his time to work for it. These employees were the persons who actually worked upon the books and records of the city and there was no evidence of weight that either Kingsley or Meany ever did work of this nature. They, with Murray, another member of the firm, upon the basis of the information given to them by their employees, worked out the actual audits, wrote portions of the audit reports and helped to formulate the comments upon the financial affairs of the city which were included. They were at times in Waterbury and were in contact with Hayes and Leary. They denied, however, having any knowledge of any irregularities; and they testified that in what they did they relied wholly upon the information received by them from their employees who worked upon the city books and records.

The only evidence to the contrary is a brief passage in the testimony of Purcell, in which he stated that he called the attention of Borgnaes to irregularities in the comptroller's office and Borgnaes stated that he had covered himself in his pencil copies, had called attention to these things, and that Kingsley, Hayes and Leary would go over the comments before the report was made. The indefinite and hearsay nature of this testimony as regards these defendants, the fact

that its context indicates that the irregularities referred to were over-expenditure of appropriations or expenditures made without appropriations, and the fact that the auditors' reports did in fact make numerous comments in regard to these matters, render this testimony an insufficient basis for any inference of knowledge on the part of Kingsley as to the payments made in fraud of the city.

There is no reasonable support for a conclusion by the jury that either Kingsley or Meany were instrumental in bringing about the disappearance of Borgnaes. There is nothing upon which to base a reasonable conclusion that these two defendants knew of the conspiracy, participated in it or intended to assist in concealing it. The jury might reasonably have found that there was gross dereliction of duty in the making of the audits because of the failure to call attention to the many irregularities, including the facts that the warrants payable sheets were not properly filled out or signed, that many items were added after they had been submitted to the board of finance, that checks were issued in many instances before the expenditures had been approved, and that payments were entered against appropriations which did not cover the matters in question or made where there was no proper appropriation. Borgnaes also may well have had knowledge of the conspiracy and at least assisted in concealing it. These defendants, however, cannot be held criminally liable in this action for negligence in the performance of their duty or that of their employees or for misconduct on the part of the latter of which they had no knowledge. *State* v. *Parker,* 112 Conn. 39, 56, 151 Atl. 325. It was error to refuse to set the verdict aside as to these two defendants.

In the appeals from the judgments, the defendants assign error in the action of the trial court in over-

ruling various motions, in sustaining demurrers to their pleas in abatement, and in overruling their motions to quash. Most of the matters raised in the motions fall substantially into three general categories: (1) those assailing the validity of the appointment of the special state's attorney and his assistants and his right to prosecute; (2) those involving claims of irregularity in the proceedings of the grand jury; and (3) those involving the claim that the defendants could not be arrested and brought to trial upon an information of the state's attorney without a preliminary hearing. It appears that on February 4, 1938, the state's attorney and assistant state's attorney for Waterbury filed with the Superior Court an application setting forth that for several weeks they had been conducting an investigation into the financial affairs of the city of Waterbury covering operations during the last few years and the disappearance, under very suspicious circumstances, from the comptroller's office, of important financial records; that in their opinion a grand jury should be at once impanelled to determine whether there had been violations of law and whether or not a prosecution should be instituted; that they felt the public interest required such an investigation and that any prosecutions which might result therefrom should be conducted by an attorney who did not reside or practice in Waterbury and had no contacts of a business or social nature with any who might be involved; that inasmuch as the applicants had resided and practiced law in Waterbury during their entire professional careers, they believed they were disqualified from further conducting the investigation, and any prosecutions that might result therefrom; and they prayed that a special attorney be appointed by the court, under § 829d of the 1937 Supplement to the General

Statutes, set forth in the footnote[1], to conduct the investigation to a conclusion and for the further purpose of instituting and conducting such prosecutions as might be warranted. On the same day, an order was entered by the Superior Court granting the application and appointing Hugh M. Alcorn as special attorney and Harold E. Mitchell and Hugh M. Alcorn, Jr., as assistants "to conduct the investigation referred to in the application." Later, after the information was filed but before the trial was commenced, the court, on October 25, 1938, entered an order confirming the appointment of the special prosecutor and his assistants and directing them to prosecute the cases of the defendants to effect.

The trial court was justified, in the absence of any objection, in accepting as true the statements of the state's attorney for the judicial district of Waterbury and his assistant, sworn officers of the court, made in the application and confirmed by their presence before it, and the reasons given were a sufficient basis for the court to exercise its discretion in holding them disqualified to carry on the proceeding. It is true that the statute refers to the state's attorney "in any county," that the state's attorney and his assistant who pleaded disqualification had been appointed under § 5365 of the General Statutes for the judicial district of Waterbury in New Haven County, and that there was, at the time, a state's attorney for New Haven County; but our statutes clearly recognize the state's

---

[1] Sec. 829d. SPECIAL PROSECUTING ATTORNEY. If the state's attorney or assistant state's attorney in any county shall be absent or disqualified to act in any cause pending before the superior court, wherein the state is a party, said court may appoint a special attorney for the prosecution of such cause; and, on application of the state's attorney, said court may appoint a special or an assistant state's attorney to aid in the prosecution of any cause.

attorney for the judicial district of Waterbury as holding a distinct office, and in our practice this has been recognized. The statute's fair intendment authorized its application in this case; otherwise in such a situation as that which arose in the judicial district of Waterbury the state would be put in an untenable position: either the criminal prosecution would have to be carried on by prosecuting officers admittedly disqualified or no prosecution at all could be inaugurated. At the time the order confirming the appointments was made and the special state's attorney and his assistants were directed to prosecute the case, the information had been filed and the case was pending. If, however, there was any defect in the appointments made, those appointed were at least de facto officers; their right to perform the duties imposed upon them could only be assailed in a direct proceeding such as by writ of quo warranto; and the question is not open upon this appeal from the conviction of the defendants. *Brown* v. *O'Connell*, 36 Conn. 432, 449; *State* v. *Carroll*, 38 Conn. 449, 471; *In re Manning*, 139 U. S. 504, 11 Sup. Ct. 624; *State* v. *Poulin*, 105 Me. 224, 229, 74 Atl. 119; *In re Gilson*, 34 Kan. 641, 644, 9 Pac. 763; *Lask* v. *United States*, 1 Pinney (Wis.) 77, 80; Constantineau, De Facto Doctrine, § 405 et seq. In fact the files in the Superior Court at Waterbury show that one of the defendants did bring a proceeding in the nature of a writ of quo warranto attacking the right of the special state's attorney to proceed in the matter; the court found that he was properly appointed and no appeal from that decision was perfected.

Upon application of the special state's attorney the trial court summoned a grand jury to carry on an investigation for the purpose of determining whether there had been violations of the criminal law. At the conclusion of that investigation, the grand jury made a

report but returned no indictment. In the light of that report the special state's attorney filed the information in this case. While, in formulating the information and in the trial which followed, the state no doubt made use of facts elicited in the course of the investigation and stated in the report, the proceedings upon that information were entirely independent of the work of the grand jury. The trial was beyond question fair and impartial and the rights of the defendants were in all respects protected. Even if there were defects in procedure in connection with the work of the grand jury, they are of no significance upon this appeal. Thus even should we assume that the defendants are right in claiming that the grand jury should not have filed the type of report that it did and that this report should not have been made public, as it was, this could not avail them upon this appeal unless it appeared that the result was to create prejudice so that they did not have a fair trial; the record is barren of any finding that this was so; and we certainly cannot assume the truth of their contention. We add, however, that the claims of the defendants of defects in the grand jury procedure because of the presence of the special state's attorney and his assistants before the grand jury and because its members were selected by the trial judge and not by the sheriff, are disposed of by our opinion in the case of *State* v. *Kemp*, 126 Conn. 60, 9 Atl. (2d) 63, and we see no reason to change the conclusions there stated. With respect to the claimed compulsory incrimination of the defendants who testified before the grand jury, no facts are found which substantiate that contention.

The report of the grand jury when filed in court was published in the newspapers; and the defendants contend that they were thereby prejudiced by reason of the publicity. It appears, however, that after the publica-

tion and after the filing of the information, the special state's attorney moved for a change of venue. His motion was denied. Some of the defendants opposed the motion and none asked for a change of venue but went to trial before a jury impanelled in the judicial district of Waterbury. If the defendants felt that the publicity given to the case would interfere with their right to a fair trial in Waterbury, they could have acquiesced in the motion for a change of venue. Having failed to do so the contention of the defendants, made after the jury's verdict, that they did not obtain a fair trial because of the publicity given the grand jury proceedings loses weight. Moreover, the printed record before us fails entirely to present any facts which would support their contention. Their claim that after the trial hostile crowds were in the streets outside of the court room is equally without merit. There is nothing in the record or in the affidavits presented by the defendants in their application to correct it to indicate that during the entire course of this long trial there was any disorder in the court room or that anything was done there whereby the court or the jury were or could have been subjected to influence harmful to the defendants.

Error is assigned in the denial of the defendants' motions to inspect the minutes of the grand jury. The purpose of these motions could not be to obtain information or evidence upon which to base an attack on an indictment, as no indictment was brought in by the grand jury in this case. At the time when the motions to inspect were made, the attack on the information based on claimed irregularities in the grand jury proceedings had already been made in pleas in abatement and motions to quash. The only purpose to be served by an inspection of the minutes of the grand jury at the time the motions were made was to

enable the defendants to ascertain the evidence in the possession of the state for the purpose of preparing their defense. It has always been the policy in this state that the proceedings before a grand jury be kept secret, exceptions being recognized for the purposes of prosecutions for perjury and contradicting witnesses. *State* v. *Fasset,* 16 Conn. 457, 466; *State* v. *Coffee,* 56 Conn. 399, 410, 16 Atl. 151. Even where a defendant is indicted by a grand jury, he has no right to inspect the testimony taken before it and the matter is at most within the discretion of the trial court, to be exercised only for strong reasons and rarely, if ever, where the purpose is merely to assist him in preparing his defense. *United States* v. *Southmayd,* 6 Biss. (U. S.) 321, 324, Fed. Cas. No. 16,361; *Eighmy* v. *People,* 79 N. Y. 546, 560; *People* v. *Diamond,* 76 N. Y. S. 57, affirmed 175 N. Y. 517, 67 N. E. 1087; *State* v. *Rhoads,* 81 Ohio St. 397, 410, 91 N. E. 186; *Havenor* v. *State,* 125 Wis. 444, 448, 104 N. W. 116; note, 27 L. R. A. (N. S.) 558; 2 Wharton, Criminal Evidence (11th Ed.) p. 1355.

The defendants made the claim that this proceeding could not be instituted upon an information by the special state's attorney without a preliminary hearing. General Statutes, § 6446, authorized the state's attorney to file an original information in the Superior Court. "The power of the State's Attorney to file in the Superior Court an original information exists by reason of his being invested with common law power of Attorney General, which in this State is greatly enlarged, because we early adopted the policy of filing an information in cases of felonies as well as misdemeanors; and, since the adoption of our Constitution, an information may be filed for every crime not punishable by death or imprisonment for life. It is then the common law of this State that authorizes the

State's Attorney to file informations in the Superior Court, both in ordinary criminal prosecutions and in those prerogative writs where he represents as Attorney General the sovereignty of the State." *State* v. *Keena,* 64 Conn. 212, 215, 29 Atl. 470; *State* v. *Carroll,* 97 Conn. 598, 600, 117 Atl. 694. The practice of filing an original information in the trial courts was in vogue before the adoption of the constitution of this state. The only provision of our constitution bearing directly on the subject is that which requires an indictment of a grand jury in cases where the punishment may be death or life imprisonment. Our constitution makes no other restriction upon the power of state's attorneys to file original informations in any other cases. The procedure followed in this case was in accordance with the practice in this state for nearly two centuries and approved by our courts. The investigation by the state's attorney and the determination by him that there is reasonable ground to proceed takes the place of a preliminary hearing by a magistrate and sufficiently fulfils all of the requirements of due process of law. We hold, therefore, that the filing of the original information was not prohibited by any provision of the constitution of this state nor is the practice inhibited by any provision of the fourteenth amendment to the constitution of the United States. *Commonwealth* v. *Posson,* 182 Mass. 339, 341, 65 N. E. 381, 382; *Hurtado* v. *California,* 110 U. S. 516, 537, 538, 4 Sup. Ct. 111, 120; *Bolln* v. *Nebraska,* 176 U. S. 83, 86, 20 Sup. Ct. 287; *Maxwell* v. *Dow,* 176 U. S. 581, 584, 20 Sup. Ct. 448, 494; *Dowdell* v. *United States,* 221 U. S. 325, 332, 31 Sup. Ct. 590.

Neither because the trial judge ordered the grand jury and presided throughout the grand jury proceedings and had passed on numerous preliminary motions, nor for any other reason, was he disqualified to preside

at the trial; the eminent fairness and impartiality with which it was conducted effectually refutes any claim of bias or prejudice on his part. 30 Am. Jur. 790. We cannot hold that the court erred in denying the motions for more specific statements, which were within its discretion; *State* v. *Pallotti,* 119 Conn. 70, 72, 174 Atl. 74; *State* v. *Murphy,* 124 Conn. 554, 561, 1 Atl. (2d) 274; *Sachs* v. *Feinn,* 121 Conn. 77, 80, 183 Atl. 384; nor in denying the motions to expunge; *State ex rel. Bonoff* v. *Evarts,* 115 Conn. 98, 100, 160 Atl. 294; nor does it appear that the defendants were in fact prejudiced in their defense by the court's rulings, and unless this is affirmatively shown there is no basis upon which the defendants can claim relief because of these rulings. Practice Book, § 309. Demurrers were addressed to the information, alleging a lack of certain specific allegations as to matters included within the scope of its general statements. In such a situation where a case has been fully tried, submitted to the jury and a verdict returned, we do not determine the questions arising upon the demurrers in disregard of the subsequent proceedings; Conn. App. Proc., § 41; and no error appearing in them, the overruling of the demurrers is insufficient ground upon which to sustain the appeal. *Hartwell* v. *Watertown,* 123 Conn. 657, 659, 197 Atl. 755.

The defendants assigned numerous errors in the finding of the trial court and in its refusal to make additions thereto. The finding in a jury case is intended merely as a narrative of the facts claimed by the parties to have been proven, made for the purpose of presenting any claimed errors in the charge or rulings of the court; and it serves no useful purpose to seek corrections as regards nonessential details or facts which do not serve to make clearer the situation as related to the claimed errors or merely for the purpose

of securing meticulous accuracy where the legal issue is fairly presented. *Peterson* v. *Meehan,* 116 Conn. 150, 153, 163 Atl. 757; *Krowka* v. *Colt Patent Fire Arm Mfg. Co.,* 125 Conn. 705, 711, 8 Atl. (2d) 5; *Daly Brothers, Inc.* v. *Spallone,* 114 Conn. 236, 243, 158 Atl. 237; *Voronelis* v. *White Line Bus Corp.,* 123 Conn. 25, 27, 192 Atl. 265. In certain instances, where the evidence was such that corrections might have been required, the situation has become academic because of our decision that the motions of certain of the defendants to set the verdict aside should be granted. Other changes sought are minor in character and do not affect the result. No substantial change can be made which would be material upon the appeals from the judgment.

The charge to the jury covers one hundred thirty-eight pages of the printed record and its delivery occupied an entire court day and parts of two others. The defendants have attacked it by more than two hundred and seventy-five separate assignments of error. Obviously it is neither feasible nor necessary to refer to each of these specifically. Some of them are made without regard for proper practice. A number are based upon the transcript of evidence instead of the claims of proof in the finding or are argued in utter disregard of either, and these cannot avail the defendants, for the validity of the charge must be tested by the finding, and by that alone. *Krowka* v. *Colt Patent Fire Arm Mfg. Co.,* 125 Conn. 705, 711, 8 Atl. (2d) 5; *Tuckel* v. *Hartford,* 118 Conn. 334, 336, 172 Atl. 222; *Boiselle* v. *Rogoff,* 126 Conn. 635, 639, 13 Atl. (2d) 753. Some involve principles of law sufficiently covered by what has been said in discussing the motions to set the verdict aside. We have, however, examined all assignments pertaining either to the refusal to grant requests to charge or to the charge as given which are

reasonably before us, and our conclusions have been reached as a result of considering them in the light of the facts claimed to have been proven at the trial and the claims of counsel in brief and oral argument. The defendants' requests to charge, in so far as they contained instructions to which they were entitled, were sufficiently and properly covered in the charge as given.

In many instances error is assigned in certain portions of the charge, which, standing by themselves, might seem to be erroneous, but which, read in connection with related instructions, were adequate and correct. As we have repeatedly held, "it is never permissible, or fair to the trial court, to detach such portions of a charge, incomplete in themselves, from the proper context, and present them as errors." *C. I. T. Corp.* v. *Deering,* 119 Conn. 347, 353, 176 Atl. 553. For example, the trial court, in charging as to the necessity of proving a criminal intent, instructed the jury that, if a man, "without gross negligence on his part," honestly believed that certain facts existed and that, in the light of those facts, the act charged against him would appear to be entirely moral, the act would not be a crime, although it might be immoral in the light of the true facts, and the defendants assigned error in the use of the words "without gross negligence"; even if, standing by itself, this might be an erroneous statement, read in the light of other instructions, in which the court emphatically stated that the guilt or innocence is to be determined upon the basis of guilty knowledge on the part of the defendants, we cannot find reversible error in the use of that phrase. The court also charged that mistake of law would not be a defense, because ignorance of the law excuses no one; but if this be read in its context, the jury could not reasonably have understood the court

to have meant otherwise than that if a man does an act which, in the light of the facts, he knows is evil or immoral and which he recognizes to be such, it makes no difference that he was ignorant of the fact that the act was expressly prohibited by law or was unlawful. So if the statement of the trial court that the state did not have to offer, in the first instance, evidence to prove that a man charged with crime actually had a guilty intent or guilty knowledge, is read in connection with the paragraph as a whole, the jury must have reasonably understood the court to mean that, in the absence of evidence to the contrary, a man is presumed to have intended to commit the acts which he did commit and that they might find the requisite guilty intent if, as a matter of fact, it is shown that those acts were unlawful. In many instances the complaint is that the court, in charging as to a particular matter, did not repeat the requirements as to all the elements involved in the crime charged necessary to establish guilt on the part of one or all the defendants, which it had elsewhere fully and adequately covered. But the jury would not reasonably have understood that thereby the court meant in any way to relieve the state of the burden of proving all the elements of the crime charged before the defendants could be found guilty. *State* v. *Weiner,* 84 Conn. 411, 415, 80 Atl. 198. "The charge is to be read as a whole and error cannot be predicated upon detached sentences or portions of it. *State* v. *Pecciulis,* 84 Conn. 152, 161, 79 Atl. 75." *State* v. *Murphy,* 124 Conn. 554, 566, 1 Atl. (2d) 274.

Assignments by several of the defendants attack the charge on the ground that the court's comments on the evidence were in the nature of an argument for the state, and that these dealt so largely with details of evidence as to confuse the jury and improperly influence their conclusions on the issues of fact. In

this connection the defendants argue that the claims of the state and of the defendants were so stated as unduly to emphasize the former and the evidence supporting them while the latter and the evidence thereof were passed lightly over. A careful consideration of the charge in its entirety, in connection with the circumstances of the trial disclosed by the record, shows that these criticisms are unwarranted. The trial was unusual in the number of defendants upon whose guilt or innocence the jury had to decide, in the scope and duration of the conspiracy charged and in the variety of acts alleged in the information as done pursuant to it, in the number of counsel participating, in the many months consumed in the taking of testimony, in the extent and diversity of arguments on behalf of the various parties, and in the length of the charge delivered by the court. The situation was one which rendered it peculiarly necessary for the court in the proper discharge of its duty not only to instruct the jury as to the legal principles involved, but also to outline clearly to them the claims on the one side and the other, and within reasonable limits to indicate the evidence bearing upon the issues so presented. This the court did and in a proper way. That it may have devoted more words to the recital of the state's claims and the evidence pertinent to them than to those of the defendants, is neither unreasonable nor a matter for proper complaint, particularly in view of the fact that none of the defendants whose assignments we are now considering took the stand to testify to his version of the matters in question. In a few isolated instances the court failed to mention all of the defendants' claims or evidence bearing upon the issue under discussion, as is not surprising in a charge of this length, but the assignments pertaining thereto cannot be sustained, particularly in the light of the court's express

caution to the jury that the decision of all questions of fact lay exclusively in their province, and that for that reason in referring to the evidence it wished to make clear that "if I omit all reference to some of the evidence which has been introduced or to some of the claims of counsel thereon please do not conclude from that that I think such evidence or claim is of no consequence. It is obviously impossible . . . to speak of all of the evidence. . . . Where I omit reference to some of the evidence I assure you that it is with no intention of minimizing the importance of that evidence or of magnifying the importance of the evidence to which I refer. It is your recollection of . . . the evidence . . . which controls, not mine, and it is your function, not mine, to appraise" its value.

One of the principal errors claimed is that the trial court instructed the jury that they might find the defendants guilty if it was proved that there was a single conspiracy either to defraud the city of Waterbury or to violate one or more of several statutes or charter provisions alleged in the information. The court emphatically instructed the jury that if they found that there was not a single conspiracy, but several distinct conspiracies in which certain of the defendants joined, the defendants who were parties only to the latter could not be found guilty. The defendants' contention is that the information charges at least two conspiracies, one to defraud the city and the other to violate certain charter and statute provisions. This is based on a misconception of the purport of the information and of the true nature of the conspiracy charged, upon a failure to distinguish between the offense and its purpose. The crime charged was a single conspiracy with the dual object or purpose of defrauding the city and of violating certain charter and statute provisions, and not two conspiracies, each to accomplish one of

these ends. The gist of the offense of conspiracy is the unlawful combination and not the accomplishment of an objective or objectives, whether lawful or unlawful. *State* v. *Parker*, 114 Conn. 354, 360, 158 Atl. 797; *State* v. *Thompson*, 69 Conn. 720, 725, 38 Atl. 868; *State* v. *Setter*, 57 Conn. 461, 469, 18 Atl. 782. Whether the information charges that the combination was formed to accomplish one or many objectives is immaterial. "A combination to commit several crimes is a single offence. . . . No matter how many violations of law may be concerted by the confederates, if the concert takes place at one time, the crime is single." *Noyes* v. *State*, 41 N. J. L. 418, 421; *State* v. *Sterling*, 34 Iowa 443, 444; *Hamilton* v. *People*, 24 Colo. 301, 303, 51 Pac. 425. "The conspiracy is the crime, and that is one, however diverse its objects." *Frohwerk* v. *United States*, 249 U. S. 204, 209, 39 Sup. Ct. 249, 63 L. Ed. 561. The defendants' contention that the reference in our opinion in *State* v. *Parker* supra, at page 368, to an "intent to cheat and defraud" as a "requisite" to the criminal conspiracy there charged determines that the element of fraud must be proven here, is incorrect. The conspiracy charged there involved fraud, both in the purpose and in the means alleged. Here, in so far as violation of charter and statute are concerned, no fraud was essentially involved as to either the purpose or the means. The information warranted the instructions and the record leaves no room for doubt that the same is true of the state's claims of proof. Such a conspiracy may properly be charged in a single count, particularly where, as was the case here, no motion is made for a separation.

The information charged a conspiracy extending over some eight years. The fact that the terms of the defendants who were elective city officials were for

only two years would not establish that there were therefore separate conspiracies limited each to a period of two years. That a defendant was an elective official was of significance only as it afforded an opportunity to further the conspiracy, and, under the state's claims of proof, each defendant who was an elective official continued to be such practically throughout the claimed duration of the conspiracy. It was necessary that the court explain to the jury the various statutes and charter provisions which were alleged in the information and involved in the facts claimed to have been proved. It may be that a conspiracy by all the defendants to violate some of them could not reasonably have been found, but under the charge of the court, none of them could be found guilty unless he participated in a single conspiracy to violate one or more of them, and a finding of such a violation by one defendant could not be in itself the basis of finding him or the other defendants guilty of the crime charged. There can be no doubt that the defrauding of the city was the fundamental object in issue, and the record shows that the case was tried and determined accordingly. This in no sense impugns, however, either the propriety or the correctness of the court's instructions just discussed, as the issues were presented by the information and the claims of proof.

In discussing the state's contention that the evidence established a single conspiracy, the court referred to its claim that running through all of the transactions by which the city was claimed to have been defrauded was the same method of operation. After mentioning the presenting of the alleged fictitious claims against the city by several of the defendants, the mechanics of obtaining payment from the city without the approval of the board of finance and the issuing of the city's checks, and the cashing thereof

in a way to conceal the identity of those ultimately receiving the money, claimed to have been involved in the method utilized, the court continued: "Such a uniformity of method does not necessarily prove that all of the transactions through which it ran were the activities of a single group. It is, òf course, possible that various separate groups acting independently may use the same method to victimize a single person. But here again it is apparent that where two or more groups of persons having one or more individuals common to all the groups use the same methods to accomplish similar purposes, the fact that they do use the same method does tend to prove that each and all of the groups are acting pursuant to a single unified scheme and that, therefore, all of the various groups together make up a single general conspiracy." The charge was correct. *State* v. *Spalding*, 19 Conn. 233, 237; *Williams* v. *Maislen*, 116 Conn. 433, 438, 165 Atl. 455; *State* v. *Murphy*, 124 Conn. 554, 564, 1 Atl. (2d) 274. What we said in the *Murphy* case (page 565) is equally true of the case before us: "Such acts constitute relevant evidence of at least potential probative value, though the weight to be given it is for the jury to determine. The court [used] these words in explanation of the nature of the evidence and properly left to the jury the question of the value to be given [it]."

The court charged that: "Under the Constitution no person accused of crime may be compelled to testify, and under the law as it is today an accused person may either testify or not, as he sees fit. In considering the question of the guilt or innocence of an accused person, however, the jury may take into consideration the fact that the accused did not testify and thereby, among other things did not submit himself to cross-examination. From the fact that the ac-

cused has either neglected or refused to testify, the jury may draw any inference as to his guilt which is reasonable under all the circumstances." The defendants claim that this charge was a most harmful violation of the constitutional rights of those of them who did not testify and was a violation of the provisions of § 6480 of the General Statutes that: "The neglect or refusal of an accused party to testify shall not be commented upon to the court or jury." In *State* v. *Ford*, 109 Conn. 490, 497, 146 Atl. 828, we said: "The constitutional privilege [which is dependent solely upon Connecticut Constitution, Article First, § 9: an accused 'shall not be compelled to give evidence against himself.'] goes no further historically or logically than to prevent the employment of legal process to compel an accused to incriminate himself by what he may say upon the witness stand. He cannot be compelled to testify against his will. The privilege of refraining from testifying, if he so elect, does not protect him from any unfavorable inference which may be drawn by his triers from his exercise of the privilege." In *State* v. *Heno*, 119 Conn. 29, 34, 174 Atl. 181, we sustained the charge of the trial court that in considering the guilt or innocence of the defendant the jury might consider the fact that he did not testify, and we said: "The fact that an accused has chosen not to take the stand is a fact in the case for the consideration of the jury. The right of the court to comment upon it, as upon any other relevant fact in the case, cannot be questioned in the absence of specific statutory prohibition of such comment. . . . The evil which the statute is designed to prevent is the placing, in the argument of the state, of undue and unfair emphasis upon the failure of an accused to testify. It does not now prohibit comment by the court upon the failure of the accused to take the stand, and the court

did not err in the comment made." Recognizing the effect of these decisions, the defendants urge that we reconsider the rule so adopted, calling attention to a contrary rule enunciated in decisions of the New York and the United States Supreme Courts. Those were predicated upon the construction of statutes of materially different content from our own. The defendants also claim that language of two earlier decisions of this court, *State* v. *Monahan*, 96 Conn. 289, 291, 114 Atl. 102, and *State* v. *Colonese*, 108 Conn. 454, 464, 143 Atl. 561, is in conflict with that in the *Ford* and *Heno* cases, thus supporting their contention. In so far as these earlier opinions contain language inconsistent with the rule laid down in the *Ford* and *Heno* cases, the former are overruled.

The charge of the court with reference to the hiring by the defendant Hayes of the defendant Purdie, a private detective, was justified by the claim of the state that this was for the purpose of getting information in regard to certain Waterbury people, for use by Hayes and Leary in preventing exposure of the conspiracy, and that he received illegal, corrupt and fraudulent payments of money from the city therefor, all in pursuance to and in furtherance of the conspiracy. The instruction was clearly warranted by the finding and the possible legal significance to be attached to the incident, if found proven, was sufficiently explained in other parts of the charge. The reference to facts found proven as coming "directly from the mouths of the various witnesses" could not have led the jury to disregard the great mass of documentary evidence which had been offered. When read with the charge as a whole, the instructions as to inferences to be drawn by the jury were not open to attack on the ground that the court did not specifically charge as to their right to draw inferences favorable to the de-

fendants. The charge of the court that the function of statements made by certain of the witnesses before the grand jury which were different from their testimony in court was not to prove the truth of the facts stated, but only to impeach the credibility of witnesses, was correct. *State* v. *Rhoads,* 81 Ohio St. 397, 91 N. E. 186; *Bomster* v. *Kenney,* 116 Conn. 290, 164 Atl. 639; *Branford Trust Co.* v. *Prudential Ins. Co.,* 102 Conn. 481, 485, 129 Atl. 379; *Wheeler* v. *Thomas,* 67 Conn. 577, 580, 35 Atl. 499; 70 C. J. 1071. The situation was not one of a retrial of a case between the same parties. That the statement was made before the grand jury and was under oath affords no reason for departing from the rule stated. In the *Rhoads* case the statement in question was given by the witness while testifying before the grand jury, and in the *Bomster* case it was made in court in another proceeding. The instruction that the absence of a motive on the part of the defendants might well tend to raise a reasonable doubt as to their guilt is not erroneous on the ground that the court should have charged that the absence of a motive would tend to prove innocence; under the instructions given, if the jury found there was reasonable doubt as to the guilt of the defendants, they would have to find them not guilty, and the effect of the charge is the same as though the court had used the language claimed by the defendants. The instructions given to the jury just before they retired, that when they returned to report they should be prepared to answer either guilty or not guilty as to each of the defendants, was in accord with time-honored instruction in this jurisdiction in criminal cases where more than one accused are on trial together; nor could it be construed as precluding the right of the jury to report a disagreement or as interfering with the right

of each juror to reach his own conclusion on the evidence.

What we said of the court's charge in *State* v. *Murphy,* 124 Conn. 554, 566, 1 Atl. (2d) 274, is true of the charge here, including whatever significance is incident to the greater magnitude of the instant case: "Following as it did a trial unusually prolonged and difficult by reason of the number of defendants and charges involved, the court's charge in this case was necessarily a long one. A study of it, however, leaves no doubt that it was most carefully prepared, logically arranged, and clearly expressed. It contained a correct and accurate statement of the law applicable to the rather complicated facts in issue, so reiterated as to afford a practical and readily understandable guide to the jury. It gave a fair and unbiased summary of the conflicting claims of the State and the defense, and concisely submitted the issues so raised to the jury for determination. In short, it fully met the requirements of our law that the court in charging the jury in a criminal case shall 'give to them such instructions as may be required to enable them to understand the nature of the offense charged and the questions which they are to decide, to weigh the evidence applicable to such questions, and to intelligently decide them.' *State* v. *Long,* 72 Conn. 39, 43, 43 Atl. 493. There was no error in the court's charge to the jury."

Some one hundred and sixty-five paragraphs of the finding are devoted to presenting rulings upon evidence to which exceptions were taken in the course of the trial. Many of these paragraphs include a number of distinct rulings, with a general assignment of error addressed to the paragraph as a whole. This is contrary to proper practice and imposes no obligation upon us to review them. *Weller* v. *Fish Transport Co., Inc.,* 123 Conn. 49, 56, 192 Atl. 317. We have, however,

examined all the rulings in the light of the claims made on the briefs of the defendants to see if substantial injustice to them could have resulted. In doing this, however, we have considered the objections made at the trial, exclusive of those advanced only in the briefs; and, on the other hand, where there are several distinct rulings in a single paragraph we have considered only those argued in the briefs. While numerous errors have been assigned in the preliminary statements made for the purpose of presenting the rulings, and in certain instances these statements are in the form of findings of fact, their purpose was merely to give a framework for a proper understanding of the ruling and its basis; Practice Book, § 359; we have interpreted them as merely findings of facts which the state might reasonably have claimed to be supported by the evidence; and so considered, there is no change which we can make which would substantially affect the correctness of the rulings. Any discussion of the individual claims of error is, of course, out of the question and we can only summarize the results of our study.

One of the objections frequently made, particularly in the earlier days of the trial, was that records and evidence of acts and statements of the defendants were admitted generally before there had been prima facie proof of the conspiracy. The state mainly relied for proof of the conspiracy upon a great mass of circumstantial evidence. For the trial court to have attempted to segregate that which tended to prove the conspiracy from that which would affect certain of the defendants only by reason of the fact that prima facie proof of the conspiracy had been made, both types of evidence often coming from the same witnesses, would have been all but impossible, and the trial court might well have considered that such an

attempt would have confused and misled the jury. The order of proof was in its discretion. *State* v. *Thompson*, 69 Conn. 720, 726, 38 Atl. 868. Thus it might properly admit testimony which would affect only certain of the defendants unless and until a case of conspiracy had been proved as to others, subject to later proof making it effective as to the latter, rather than in the first instance restricting the evidence to prima facie proof of the conspiracy and later, when such a case had been made, attempting to call it to the attention of the jury in such a way that they would recall and properly consider it. The principle is well expressed in *Dimon* v. *Romeo*, 99 Conn. 197, 201, 121 Atl. 352, to which we refer without quotation. Admitting evidence which would be irrelevant unless other evidence establishing a connecting link were later offered, upon the promise of the state subsequently to offer such evidence, was also in the discretion of the court. *De Cicco* v. *Mason*, 106 Conn. 99, 101, 136 Atl. 869. In neither instance can we hold that the trial court abused its discretion in the rulings it made.

None of the evidence to which objection was made that it constituted a variance from the allegations of the information dealt with matters not reasonably included within the scope of permissible evidence upon the charge of the conspiracy alleged by the state. *Meyers* v. *United States*, 36 Fed. (2d) 859, 861; *People* v. *Simos*, 345 Ill. 226, 235, 178 N. E. 188. That the testimony involved other persons than the defendants is of no consequence nor was it a valid objection that testimony was admitted as to payments made to and equipment owned by corporations of which certain of the defendants were officers, for the conspiracy would be none the less criminal whether its object was to obtain an illegal profit for the corporations or the individual defendants. Testimony that the corporations

owned little or no equipment with which to carry on the work for which payments were made to them was a fact tending to prove one aspect of the general conspiracy alleged, and admissible as such. The statements in the tax lists of these corporations as to their personal property constituted admissions by them as to the extent of their ownership of such property, in view of the provisions of the statutes requiring property owners to put in lists of property owned by them and the oaths attached to such lists; General Statutes, § 1133, ff.; *Jenkins* v. *Reichert,* 125 Conn. 258, 264, 5 Atl. (2d) 6; 5 Wigmore, Evidence (3d Ed.) § 1640, p. 556; and there was sufficient evidence from which, if prior authority of one of the persons who put in such lists for one of the corporations as its agent was lacking, it could reasonably be found that his acts were ratified.

The knowledge of the head accountant in the office of the comptroller of the city and of the clerk from the tax collector's office, acquired from long familiarity with the methods of operation of those officers was the result of their sense perceptions applied to facts with which they were continually dealing and was an adequate basis of knowledge upon which to base the testimony they gave. The same is true of the testimony of the expert accountant called by the state as regards the effect of documents used in the banks as to which he acquired his knowledge from a study of their records and practices. See 2 Wigmore, op. cit., § 657. The basis of such testimony is not essentially different from that which qualifies a witness to testify as to a custom. *Olesen* v. *Beckanstin,* 93 Conn. 614, 621, 107 Atl. 514.

Previous to 1931, the statutes provided that in the action of book debt, the entries of the respective parties in their books should be admissible in evidence.

General Statutes, § 5878. In that year an act was passed, which was entitled "An act concerning the Admissibility of Business Entries," which repealed the chapter of the statutes dealing with book debt, and a copy of which is printed in the footnote.[1] Public Acts, 1931, Chap. 56; General Statutes, Cum. Sup. 1935, § 1675c. This act is obviously not restricted to actions of book debt. We have approved its application to the admission of hospital records in an action to recover for personal injuries. *Borucki* v. *MacKenzie Brothers Co., Inc.*, 125 Conn. 92, 99, 3 Atl. (2d) 224. It establishes a general rule as to the admissibility of evidence applicable in criminal as well as civil cases. The justification for admitting such evidence is that entries made in the regular course of business and relating to that business are intended to serve its interests and are therefore presumably correct and accurate. We have no disposition to narrow the scope of the statute, which we believe to be sound in principle and advantageous in avoiding technicalities as to production of

---

[1] Sec. 1675c. BUSINESS ENTRIES. Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of such act, transaction, occurrence or event, if the trial judge shall find that it was made in the regular course of any business, and that it was the regular course of such business to make such writing or record at the time of such act, transaction, occurrence or event or within a reasonable time thereafter. Such writing or record shall not be rendered inadmissible by (1) a party's failure to produce as witnesses the person or persons who made the writing or record, or who have personal knowledge of the act, transaction, occurrence or event recorded or (2) the party's failure to show that such persons are unavailable as witnesses. Either of such facts and all other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect the weight of such evidence, but not to affect its admissibility. The term "business" shall include business, profession, occupation and calling of every kind.

evidence. The trial court could properly rule that under it ledger items in the books of a broker's office, bank deposit slips, and records of requests made to the state police were admissible. The so-called "work sheets" of the head accountant in the comptroller's office were "admissible as a memorandum of details essential to the full proof of transactions in issue, proved to have been correctly made by [him] at the time of such transactions." *New Haven Trust Co.* v. *Doherty,* 74 Conn. 348, 352, 50 Atl. 890; *Curtis* v. *Bradley,* 65 Conn. 99, 114, 31 Atl. 591. The admission of such documentary evidence does not violate the constitutional requirement that an accused has a right to be confronted by the witnesses against him. *State* v. *Torello,* 103 Conn. 511, 513, 131 Atl. 429.

The presentation of this case involved the production in court of a vast mass of books and records covering the financial affairs of the city of Waterbury over a period of some eight years, as well as many bank records and the like. These records were all in evidence or in the court room available to the defendants. It is true that they included many items which were irrelevant to any issue in the case, but to have attempted to separate and offer in evidence only those which were relevant would have been an almost insuperable task and would have produced great confusion and delay, and no substantial harm could have resulted to the defendants from including the irrelevant matter. Whether to admit the records as a whole was within the discretion of the trial court. *Brown* v. *Butler,* 71 Conn. 576, 582, 42 Atl. 654. Moreover, to furnish a basis for the testimony of the expert accountant called by the state, whose testimony is discussed a little later, it was necessary that all the city records should be available in court. That the defendants were not present when the records were made

or were not parties to them did not make them inadmissible. The entries were evidence of the transactions they set forth and therefore of facts in themselves relevant and material. *Brown* v. *Canty,* 115 Conn. 226, 230, 161 Atl. 91. There was sufficient evidence that the records of the city, which had been removed by the state in the course of its investigation, had not been tampered with reasonably to satisfy the trial court upon the preliminary inquiry as to whether they were in the same condition when offered in evidence as when they were removed from the offices of the city.

The matter contained in these records could only have been of value to the jury in deciding the case if it was systematized, summarized and explained. For that purpose the state produced as a witness an expert accountant, Brown, whom the court properly found to be qualified. He testified in regard to the methods followed in handling the finances of the city as disclosed in the records before him, and as to the purpose of certain requirements, which to a layman might not be clear but which as an expert accountant he understood. Upon the basis of his study of the records he testified that certain documents or parts thereof were missing; he interpreted and explained various entries in the light of that knowledge, and if in the course of so doing, he read from the records and from the city charter, this is of no consequence, for that was merely a substitution for this being called to his attention by the state's attorney in examining him; he traced certain payments and stated certain conclusions he had reached upon the basis of the records as to the persons to whom the money went, and in so doing used records, not only of the city but of certain banks; he analyzed the financial records before him and reconstructed missing records from other available data; he

testified that a search of the records failed to disclose
certain matters relevant to the issues; and he made his
own summaries based on the records and the results of
his study of them. These matters were all within the
proper field of testimony by an expert accountant.
*Elmira Roofing Co.* v. *Gould,* 71 Conn. 629, 42 Atl.
1002; *McPhelemy* v. *McPhelemy,* 78 Conn. 180, 183,
61 Atl. 477; *Schaefer, Jr., & Co.* v. *Ely,* 84 Conn. 501,
509, 80 Atl. 775; 4 Wigmore, op. cit., § 1230. While
he often stated matters as facts, and often they were
in the nature of conclusions he had reached, they were
in essence merely statements of his opinions, the
weight and soundness of which were for the jury to
determine. If, in certain instances, a special act of
the General Assembly avoided the effect of certain
transactions which he termed illegal diversions, he ex-
plained the basis of his opinion and the court left the
jury in no doubt as to the legal effect of the act.

In the course of the examination of two of the state's
witnesses who had testified before the grand jury, it
appeared that they had made statements before it con-
tradictory to certain testimony given on the trial.
Thereupon the defendants moved that the testimony
of those witnesses before the grand jury be made avail-
able to them. The trial court, having been furnished
with a copy of all the testimony, granted the motions
except as to certain portions of that examination which
it held were in no way concerned with the affairs of
the city of Waterbury or the direct examination.
These portions were marked as an exhibit for identi-
fication, but counsel for the defendants were not per-
mitted to examine them. The purpose of the trial
court was to make available to the defendants so much
of the testimony of the grand jury as would serve their
interests, but to preserve the secrecy of the grand jury
proceedings by withholding the rest of it. The situa-

tion was unusual, but not without its analogies in court proceedings; thus, where a document is produced in court by the adverse party upon order, the trial court, having inspected the document, has a discretion to permit or refuse inspection by opposing counsel. *Hurley* v. *Connecticut Co.*, 118 Conn. 276, 284, 172 Atl. 86. In this instance, an examination of the portions of the testimony withheld from the defendants amply justifies the disposition made of the matter by the trial court, and shows that no prejudice was caused them by its ruling.

The defendants contend that there was error in admitting testimony as to certain statements of individual defendants after the claimed termination of the conspiracy. In the general brief of the defendants reference is made to a paragraph in the finding in which the investigator for the state related a series of incidents, including statements by some of the defendants, but this single paragraph covers some twenty-seven pages of the printed record and includes considerably more than that number of distinct rulings, and, very properly, it is not assigned as error. The information alleged that the conspiracy continued to the date of the information, May 19, 1938; there is no finding that it had terminated before that date; and on the other hand, the state offered evidence in support of the allegation in the information and that all the matters stated in the finding, including the statements in question, formed a part of the conspiracy and were in pursuance of it. Consequently there is no basis upon which we can hold that statements made by any of the defendants before that day were in fact made after the conspiracy had terminated. In fact, the substantial objection in most instances seems to have been based, not on the fact that the conspiracy had terminated, but that no prima facie proof of a con-

spiracy had been offered when the testimony was admitted. This objection has already been disposed of. Moreover, in most instances the objections were that the testimony was not admissible at all, and such objections do not furnish ground for claiming that it should have been restricted as regards its effect on other defendants than those testified to have made the statements. *State* v. *Buonomo,* 88 Conn. 177, 183, 90 Atl. 225. In the only instance of which complaint is made in the briefs where there was a request that the effect of the testimony be restricted to the defendants immediately concerned, that request was for an instruction that the testimony did not affect the particular defendants represented by the attorney who made the objection and we have found that the state failed to prove them guilty. Obviously the general stipulation made early in the trial that an objection made by one defendant would avail all cannot be construed to include such a situation as this, where the statements were clearly admissible as to some at least of the defendants. None of the rulings of this nature afford any sound ground upon which the defendants can properly base a claim of error.

It is truly remarkable that in a trial lasting over so long a period as this, and so complicated in the issues presented and nature of the proof required, there are so few rulings that are even questionable. We cannot better sum up the results of our study than by quoting what we said in *State* v. *Parker,* 114 Conn. 354, 370, 158 Atl. 797: "None of the rulings involve error which can fairly be regarded as harmful. Rarely, if ever, can studious and minute search of the record of a case of magnitude and complexity, tried, as was this, in extreme detail and with zeal and resourcefulness, fail to develop some point or ruling which may technically be open to question. We find none here which is not,

at most, minor and inconsequential, and the defendants could not have been so prejudiced thereby as to warrant or suggest a new trial."

Conspiracy, at the time of the offense alleged in the information, was in this state a crime at common law. *State* v. *Thompson,* 69 Conn. 720, 725, 38 Atl. 868; *Fimara* v. *Garner,* 86 Conn. 434, 85 Atl. 670; *State* v. *Murphy,* 124 Conn. 554, 562, 1 Atl. (2d) 274. The statute applicable to the offense, in effect until 1937, provided five years as the maximum period of imprisonment for its commission. General Statutes, § 6500; Cum. Sup. 1935, § 1728c. In that year the statute was amended so that the maximum period of imprisonment was increased to fifteen years; General Statutes, 1937 Sup., § 870d; and that law was in effect when the defendants were sentenced. 1939 Supplement, § 1469e. The trial court imposed a sentence upon several of the defendants of imprisonment for a period of more than five but not exceeding fifteen years. It is contended that it could not properly sentence the defendants under the law as amended, which became effective only after the conspiracy was alleged to have begun. The information charged a continuing conspiracy beginning on January 1, 1930, and continuing until the date of the information, May 19, 1938. The case was not one where, a specific agreement having been made upon a certain date, thereafter overt acts in pursuance of that agreement were committed, but was one where it was alleged and found proven by the verdict of the jury that the conspiracy itself was a continuing one. A statutory provision imposing a heavier penalty for a crime where it is still being carried on at and after the date the act takes effect does not violate the provision in Article I, Section 10, of the Constitution of the United States, prohibiting any state from passing an ex post facto law. In *People* v.

*Walczak,* 315 Ill. 49, 51, 145 N. E. 660, where the statute of Illinois punishing conspiracies was amended during the existence of a continuing conspiracy, it was held that the defendant was properly sentenced under the amended law. In *Waters-Pierce Oil Co.* v. *Texas,* 212 U. S. 86, 29 Sup. Ct. 220, despite the provision in the federal constitution to which we have referred, it was held that the plaintiff corporation was properly convicted under the federal anti-trust law although it had not even been created when the agreement in pursuance of which the acts with which it was charged were committed and that agreement was legal when made; and the court said (p. 108): "But in view of the facts found in the state court, to which we have already referred, there was ground for conviction, not because of the making of the old agreement for the division of the territory and the suppression of competition while the old company was in existence, but because the new company was found to have carried out the old agreement and made itself a party thereto, and by continuing the old arrangement after the passage of the law, had brought itself within its terms."

The situation is not one where the defendants were subjected to a heavier penalty for committing a crime which had been consummated when the statute was amended. Such a conspiracy as that here alleged is a continuing offense. *State* v. *Kemp,* 126 Conn. 60, 85, 9 Atl. (2d) 63; *Jones* v. *United States,* 89 C. C. A. 303, 162 Fed. 417, 427; *Wilson* v. *United States,* 111 C. C. A. 231, 190 Fed. 427, 435; *People* v. *Mather,* 4 Wend. (N. Y.) 229, 260; *Matter of Doyle,* 257 N. Y. 244, 256, 177 N. E. 489; *Commonwealth* v. *Bartilson,* 85 Pa. St. 482, 489; *Commonwealth* v. *Donnelly,* 40 Pa. Supr. Ct. 116, 125; *Lorenz* v. *United States,* 24 App. D. C. 337, 387; *Fire Ins. Cos.* v. *State,* 75 Miss. 24, 36, 22 So. 99. In *State* v. *Kemp,* supra, we quoted from *United*

*States* v. *Kissel,* 218 U. S. 601, 607, 31 Sup. Ct. 124, as follows: "But when the plot contemplates bringing to pass a continuous result which will not continue without continuous cooperation of the conspirators to keep it up, and there is such continuous cooperation, it is a perversion of natural thought and of natural language to call such continuous cooperation a cinematographic series of distinct conspiracies, rather than to call it a single one." In continuing the conspiracy after the statute was changed, the defendants violated it in its amended form and became subject to the penalties it imposed. The trial court committed no error in imposing sentences under the act of 1937.

There is no error on the appeals of Hayes, Leary, Kelly, Fleming, Dunn, Santalucia, Healey, Coppeto, Minor and Johnston. There is error in the denial of the motions to set aside the verdicts against O'Connor, Alderman, Kingsley and Meany, the judgment is set aside as to them and the case remanded with direction to grant their motions to set the verdicts aside.

In this opinion the other judges concurred.